**CHARLES BROADWAY ROUSS, Inc., v. WINCHESTER CO.** *

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

No. 131.

1. **Trade-marks and trade-names and unfair competition** ☞9—**Geographical name not subject of trade-mark.**

Subject to certain exceptions, no one can acquire an exclusive right to the use of a geographical name as a trade-mark.

2. **Trade-marks and trade-names and unfair competition** ☞10—**Name of individual not subject of trade-mark.**

The mere name of an individual cannot become a valid technical trademark.

3. **Trade-marks and trade-names and unfair competition** ☞45—**Registration under act of 1920 not evidence of title.**

Registration under Trade-mark Act of 1920 (41 Stat. 533) is not even prima facie evidence of title to the words or name registered as a trademark.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 266 U. S. —, 45 Sup. Ct. 92, 69 L. Ed. —.

**4. Trade-marks and trade-names and unfair competition ⬦70(3)—That geographical or personal name has acquired secondary meaning does not constitute it a valid common-law trade-mark.**

That a geographical or personal name, by its use as a trade-mark, has acquired a secondary meaning, does not constitute it a valid trade-mark at common law, though the user is entitled to protection against its use by another in such manner as to deceive the public and amount to unfair competition.

**5. Trade-marks and trade-names and unfair competition ⬦99—Unfair competition always question of fact.**

Unfair competition is always a question of fact in each case.

**6. Trade-marks and trade-names and unfair competition ⬦70(3)—Defendant held not chargeable with unfair competition.**

Complainant for 20 years had used the name "The Winchester" as a trade-mark for shirts manufactured for it, and which it sold chiefly at wholesale to retail dealers throughout the United States. Defendant, the Winchester Company, recently organized, is affiliated with the Winchester Repeating Arms Company, which for more than 50 years has used the name "Winchester" in connection with its arms and ammunition. Defendant commenced the manufacture in a part of the Arms Company plant of other articles, chiefly sporting goods, including shirts, on which it also used the name "Winchester." It adopted the name in good faith and without knowledge of its use by complainant. It sold its products only at retail through "Winchester Stores," consisting of stores owned by the Arms Company and agency stores, dealing in arms, ammunition, and sporting goods, all of which stores bore the name "Winchester Store" prominently on their signs or front windows in peculiar staggered lettering, which was also used for the trade-mark. *Held* that, while complainant did not have a valid common-law trade-mark right in the name, it had acquired a secondary meaning which entitled complainant to protection in its use against unfair competition, but that defendant considering its reasons for adopting the name and the manner in which its goods were sold, was not chargeable with unfair competition.

**7. Trade-marks and trade-names and unfair competition ⬦67—Complainant's rights not affected by fact that he does not manufacture his goods.**

It is not important that a complainant does not himself manufacture the goods on which he uses his trade-mark, but it is sufficient if he has them manufactured for him and controls them.

**8. Trade-marks and trade-names and unfair competition ⬦75—Sufficient to establish unfair competition if deception will be the natural and probable result of defendant's acts.**

To establish unfair competition it is not necessary to show that particular customers have been deceived, but it must appear that deception will be the natural and probable result of defendant's acts.

**9. Trade-marks and trade-names and unfair competition ⬦68—Essence of "unfair competition" is palming off goods of one as those of another.**

The essence of the wrong in unfair competition is that defendant is palming off its goods as those of complainant, and if defendant so conducts its business that such result does not follow the suit fails.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

**10. Trade-marks and trade-names and unfair competition ⬦68—To constitute unfair competition, parties must be competitors for the particular trade involved.**

There can be no unfair competition, unless complainant is in fact a rival in the particular territory for the trade which defendant secures therein.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Connecticuit.

Suit in equity by Charles Broadway Rouss, Inc., against the Winchester Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 290 Fed. 463.

This suit is brought on the ground that the defendant is infringing the plaintiff's trade-mark and is engaged in unlawful competition. The plaintiff claims an exclusive common-law trade-mark in the word "Winchester" for shirts and other merchandise to which it applies the mark. It also claims rights in the use of the trade-mark because of its registration in the United States Patent Office, and for which there was issued certificate of registration, serial No. 139,698, registered on February 8, 1921. The plaintiff's trademark, as shown in the drawing accompanying the plaintiff's application for its registration, is as follows:

The bill alleges that the defendant fraudulently adopted the word "Winchester" designedly, and for the purpose of inducing the public to purchase its shirts and other articles, in the belief that it was buying shirts and other articles placed on the market by the plaintiff, and that the defendant, in adopting such a name for its shirts and other merchandise, did so designedly, willfully, and for the purpose of defrauding the public and the plaintiff, and in unfair competition with the plaintiff, and that it selected said name because thereby said name in itself would mislead and deceive the public into purchasing and using defendant's shirts, etc., under the mistaken belief that the same were those of the plaintiff, and for the purpose of depriving the plaintiff of its rights under its trade-mark, and in infringement of the plaintiff's rights at common law, and that the defendant is now continuing and threatens to continue all of the said unlawful acts and doings complained of.

The plaintiff asks for an injunction to restrain the defendant from the use of the name "Winchester" in connection with the sale of shirts and other articles of wearing apparel of the same general character as that sold by the plaintiff in association with its trade-mark "Winchester." By this use of its trade-mark it claims it has been damaged by the defendant in the sum of $50,000. In addition to the injunction, it asks that the defendant be decreed to account for and pay over to it the income and profits which it is asserted have been unlawfully derived from the violation of the plaintiff's exclusive rights in and to the trade-mark.

The bill asserts, and the answer admits, that the plaintiff and defendants are engaged in interstate commerce. The answer denies that the plaintiff is the owner of any valid trade-mark in the name "Winchester." It denies that it has any common-law trade-mark rights in and to that name, or that the word has acquired a secondary meaning in the trade or among purchasers in respect to merchandise of the plaintiff.

The plaintiff's predecessor in business, Peter W. Rouss, adopted and began to use as a trade-mark the name "Winchester" in connection with the sale of men's furnishings and more particularly shirts. This use of the name began as early as March, 1900, and since that time it has been continuously so used by the plaintiff or its predecessor in title for the purpose of distinguishing certain of its merchandise in men's furnishings, and particularly in connection with the sale of its shirts.

The plaintiff is a New York corporation, and is engaged in the wholesale dry goods business. It conducts its business in the city of New York, and alleges that it is vested with all the rights of its predecessor, including the good will of the business and the trade-marks and trade-names. In addition to its claim of a common-law trade-mark, it claims that the word "Winchester," due to long and continuous use, has acquired a secondary meaning, "both in the trade and among purchasers in general," and indicates that shirts and other merchandise to which it is applied are the products of the plaintiff

and its predecessor in title. It alleges that on January 1, 1918, Peter W. Rouss, doing business under the name of Charles Broadway Rouss, Inc., sold and assigned to the plaintiff all the right, title, and interest in the trade-mark.

It appears that in 1865 the General Assembly of the state of Connecticut granted a special charter (Sp. Laws 1865, p. 127) to O. F. Winchester and four associates, incorporating them and such other persons as should be associated with them into a corporation by the name of the Henry Repeating Arms Company, for the purpose of manufacturing every variety of firearms and other implements of war, and all kinds of machinery adapted for the construction thereof. The incorporators did not immediately perfect their organization, and in the following year, 1866, the following resolution was passed by the General Assembly: "Resolved by this Assembly, that the name of the Henry Repeating Arms Company, a corporation chartered at the May session of the General Assembly A. D. 1865, but not yet organized, be and the same is hereby changed to that of the Winchester Repeating Arms Company." Sp. Laws 1866, p. 140. The act of 1865 fixed the amount of the capital stock at $500,000, with liberty to increase the amount to $1,000,000. In 1909 the General Assembly of the state of Connecticut passed a joint resolution (Sp. Acts, p. 1903) by which the Winchester Repeating Arms Company was "hereby authorized and empowered to increase its capital stock beyond the amount now authorized."

In 1919 proceeding under the incorporation laws of the state of Connecticut there was incorporated the Winchester Company, the defendant herein. That company was organized, among other things, for the purpose of taking over the ownership and control of the Winchester Repeating Arms Company. Pursuant to the powers granted to it in its certificate of incorporation, it purchased or obtained control of the Winchester Repeating Arms Company, which became its subsidiary. It obtained the right to use all the trade-marks and trade-names of the Winchester Repeating Arms Company. While the defendant is in part a holding company, it has been and is an operating company, in so far as it has established retail stores for selling and dealing in sporting goods of all kinds, including wearing apparel, fishing tackle, baseball, football, and tennis supplies, hardware, cooking utensils, and similar goods. The first retail store of the defendant, operating under the name "The Winchester Store," was opened in Providence, R. I., in April, 1920, and since that time the defendant has been doing a retail business there in the lines of merchandise above mentioned. Since that time other similar stores, each known as "The Winchester Store," have been opened by defendant, and it has commenced, and is now conducting a retail business in New Haven, New York, and elsewhere, and its retail stores deal in and sell, among other things, various products including firearms and ammunition, and other articles manufactured by or procured from its subsidiary company, Winchester Repeating Arms Company. The certificate of incorporation of defendant fixed the amount of the capital stock at $30,000,000, and declared that the corporation "is to be located in the town of New Haven in the state of Connecticut," which is also the location of the Winchester Repeating Arms Company.

The principal business of the Winchester Repeating Arms Company from the year 1867 to the year 1920, and to the time when the Winchester Company was formed, consisted principally, and now consists partly, in the manufacture and sale of firearms and ammunition, and especially in the manufacture and sale of the Winchester repeating rifles and Winchester shotguns and Winchester ammunition, all of which products have been for a long time past well known throughout the world. The Winchester Repeating Arms Company has used the trade-mark or trade-name "Winchester" upon its goods continuously from about 1867 up to the time this suit was brought, and has extensively advertised the same.

In the answer which is interposed in this suit it is alleged that, in exhibiting the trade-mark or trade-name "Winchester" on its goods, the Winchester Repeating Arms Company has applied the same in block lettering and in script and otherwise, but more especially, since in or about the year 1901, has exhibited the name or mark to a large extent in a particular form or style of so-called staggered or saw-tooth lettering, often in a particular shade of red,

upon its ammunition, guns, and other products, and the packages or containers therefor. It also appears that the Winchester Company, the defendant herein has used the trade-name "Winchester" upon shirts and other articles of merchandise which it sells in its stores, and that its lettering is in the staggered or saw-tooth form used by the Winchester Repeating Arms Company since the year 1901. The staggered form of lettering so used is indicated below.

*WINCHESTER*

TRADE MARK

It appears that the name "Winchester," or "The Winchester Store," has been prominently displayed, usually with the name "Winchester" in red, and with the letters thereof in the staggered or saw-tooth form, upon its store fronts, and upon many of the articles of merchandise handled by the retail stores of the defendant, and that the name "Winchester," as used upon said articles of merchandise, is of the same distinctive form and style as had been used by the Winchester Repeating Arms Company since the year 1901. The purpose of organizing the Winchester Company is disclosed by the record. The Winchester Repeating Arms Company at the close of the World War had a large plant, which had been greatly developed and enlarged during the war. It was desired to develop means of filling the plant with business and enlarging the kind of business that was to be carried on. For that reason the Winchester Company was organized and took over the control of the Winchester Repeating Arms Company. The two companies have the same chairman of the respective boards of directors. They have the same president, the same treasurer, and the same secretary.

During the hearing of the case in the court below the following occurred:

"Mr. Rockwell: I will ask counsel for the plaintiff if he will concede that the Winchester Repeating Arms Company and the Winchester Company are closely affiliated, and have the same policies, and work together in close harmony, and share the trade-mark 'Winchester' as used by the Winchester Repeating Arms Company and the Winchester Company.

"Mr. Anderson: I concede it all, but I deny its relevancy."

Again:

"Q. Is the Winchester Company a selling organization to any extent? A. It is to some extent; yes. It is partially a holding company and partially a selling company. It participates in a general sales policy, which is worked out by the two companies.

"Q. And it operates a number of retail stores? A. It operates a number of retail stores.

"Q. Are there any further retail stores with which the Repeating Arms Company is connected, other than those of the Winchester Company? A. Yes; there are about 4,200 retail dealers who are stockholders in the Winchester Repeating Arms Company.

"Q. What is a prerequisite to their obtaining contracts or making arrangements with the Winchester Repeating Arms Company? A. They are required to own some share of stock of the Winchester Company."

The bill charges and the evidence shows that the Winchester Company sells shirts and certain articles of wearing apparel in the Winchester Stores and that it places upon them its trade-mark or trade-name "Winchester."

The District Court has decided that the plaintiff acquired a good common-law trade-mark in the name of "Winchester," and that its registration of that trade-mark was good and valid. It also held that the defendant had infringed, and was also guilty of unfair competition, and it entered a decree requiring the defendant to account. The interlocutory decree which was entered granted an injunction the terms of which may be found in the margin.[1] The

---

[1] "Ordered, adjudged, and decreed that the defendant, the Winchester Company, its associates, officers, agents, clerks, employees, attorneys, and affiliated companies, be enjoined and restrained by the injunction of this court from

decree enjoins not only the Winchester Company, the actual defendant, but also the Winchester Repeating Arms Company, which, as we have seen, is an affiliated company that has existed under that name since 1866.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

Archibald Cox and Arthur Wm. Barber, both of New York City, and Henry E. Rockwell, of New Haven, Conn., for appellant.

Munn, Anderson & Munn, of New York City (T. Hart Anderson, Orson D. Munn, and John K. Brachvogel, all of New York City, of counsel), for appellee.

ROGERS, Circuit Judge (after stating the facts as above). There are certain terms and words which cannot be monopolized as trade-marks. The general and well-established rule is that a geographical word, used to designate a locality, a section of a country, or a country, cannot be monopolized as a trade-mark at common law. The name "Winchester" is a geographical one, there being a place of that name in each of 19 states. Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Saxlehner v. Eisner, etc., Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60; Castner v. Coffman, 178 U. S. 168, 20 Sup. Ct. 842, 44 L. Ed. 1021; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144; Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581.

In the Columbia Mill Co. Case, supra, certain general principles of law applicable to trade-marks and the conditions under which a party may establish an exclusive right to the use of a name for such a purpose are laid down. The last of the rules there stated is the following:

"(4) Such trade-mark cannot consist of words in common use as designating locality, section, or region of country."

[1] This court, in Scandinavia Belting Co. v. Asbestos & Rubber Works, 257 Fed. 937, 169 C. C. A. 87, examined at some length the right to use a geographical name as a trade-mark. It was then pointed out that the Circuit Courts of Appeals in the Fourth, Sixth, Seventh, and Eighth Circuits had held that no one can acquire an exclusive right to the use of a geographical name as a trade-mark. In the Scandinavia Case we reached the same conclusion, while recognizing the undoubted fact that the general rule was subject to certain exceptions. But the facts of the instant case do not bring it within any of the limited recog-

the further and continued infringement of plaintiff's common-law rights in and to the trade-mark 'The Winchester,' and the rights secured by the certificate of registration of the trade-mark 'The Winchester' for shirts, No. 139,-698, dated February 8, 1921, and from unfair competition with plaintiff, and more particularly from the use of the name 'Winchester' as applied to or associated with such merchandise sold in interstate commerce, and more particularly with shirts, including dress shirts, flannel shirts and nightshirts, men's underwear and pajamas, men's made-to-order clothing, jumpers, and overalls, neckties, collars, shoes, hats, caps, and watches, whether the said name 'Winchester' be directly applied thereto, or appear upon wrappers or containers in which the said merchandise is inclosed, or from advertising in any manner or from the sale of, or the offer to furnish, such merchandise under the name 'Winchester.'"

nized exceptions, and they do not need to be now considered. And in Siegert v. Gandolfi, 149 Fed. 100, 79 C. C. A. 142, this court said:

"Undoubtedly the Siegerts did not, and could not, acquire such a monopoly in a geographical name as a trade-mark or trade-name as would entitle them to prevent others from using it under any circumstances."

But it is to be noted that neither the plaintiff herein nor the defendant is carrying on business in any place or district of country named "Winchester," and the goods they sell and mark "Winchester" are not made for them in any such place. Moreover, we do not regard its use by either the plaintiff or the defendant in this case as geographical. It is rather the use of a surname, on the part of both plaintiff and defendant. Peter W. Rouss, the founder of the plaintiff's business, was Peter Winchester Rouss. And the name of Winchester seems to have been given to the Winchester Repeating Arms Company because the person chiefly concerned in its organization was Oliver F. Winchester, one of the original incorporators, which also explains its use by the company as a trade-name which it affixed to the goods that it sold.

[2] But it is also a general and well-established rule of the common law that the mere name of an individual cannot become a valid technical trade-mark. Scale Co. v. Wyckoff, 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972; Brown Chemical Co. v. Myer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247; Havana Commercial Co. v. Nichols (C. C.) 155 Fed. 302; Merriam Co. v. Syndicate Publishing Co., 237 U. S. 618, 622, 35 Sup. Ct. 708, 59 L. Ed. 1148. The court below held that the trade-mark or trade-name of the plaintiff was validly registered in accordance with the act of 1905 (Comp. St. § 9485 et seq.), but that it was effective only as to shirts, and that as to all other articles the status of the plaintiff was that of the owner of a common-law trade-mark. For reasons already expressed, we think the court was in error in holding that the plaintiff had a valid common-law trade-mark.

We think it plain that the court was also in error as to the effect of the registration under the act of Congress. In the first place, the registration was not under the act of 1905, but under the act of 1920 (Comp. St. Ann. Supp. 1923, § 9516a et seq.). The effect of a registration under the act of 1920 is very different from that under the act of 1905, as will appear as we proceed.

[3] The act of 1905 confers no title to marks registered under it, but merely makes registration under it prima facie evidence of title derived from use at common law. But the act of 1920 does not give to registration under it any effect as a source of title or as evidence thereof. It does not make registration under it even prima facie evidence of title. Section 16 of the act of 1905 declares that registration under the act "shall be prima facie evidence of ownership." 33 Stat. pt. 1, c. 592, p. 728 (Comp. St. § 9501). And Act March 3, 1881, § 7, contained a similar provision. 21 Stat. c. 128, pp. 502, 503. The omission of a like provision in the act of 1920 we cannot assume was an inadvertence. Whatever may be the rights of the plaintiff acquired by its registration of the words "The Winchester" under the act of 1920, we are satisfied that it did not obtain thereby even a prima facie title to the words as a trade-mark or trade-name.

This brings us to a consideration of these acts. As a surname, although not susceptible of exclusive appropriation as a trade-mark at common law, frequently acquired a special signification in connection with particular articles of merchandise, Congress in recognition of this fact passed the Act of February 20, 1905, 33 Stat. 724, which authorized, with certain restrictions, the registration of surnames as trade-marks. We desire to point out that prior to the enactment of the act of 1905 Congress had conferred no authority to register a proper name as a trade-mark. The act of March 3, 1881, expressly denied the right of an applicant to obtain a trade-mark upon his own name. 21 Stat. 502. So that the act of 1905, in conferring the right of an applicant to obtain a trade-mark upon his own name, conferred a right not recognized at common law. See Merriam Co. v. Syndicate Publishing Co., 237 U. S. 618, 622, 35 Sup. Ct. 708, 59 L. Ed. 1148. The act of 1905 provided in section 5 as follows:

"That no mark by which the goods of the owner of the mark may be distinguished from other goods of the same class shall be refused registration as a trade-mark on account of the nature of such mark unless such mark: * * * Provided, that no mark which consists merely in the name of an individual, firm, corporation, or association, not written, printed, impressed, or woven in some particular or distinctive manner or in association with a portrait of the individual, or merely in words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods, or merely a geographical name or term, shall be registered under the terms of this act: * * * And provided further, that nothing herein shall prevent the registration of any mark used by the applicant or his predecessors, or by those from whom title to the mark is derived, in commerce with foreign nations or among the several states or with Indian tribes, which was in actual and exclusive use as a trade-mark of the applicant, or his predecessors from whom he derived title, for ten years next preceding the passage of this act."

And the Act of March 19, 1920, § 1 (b), 41 Stat. 533 (Comp. St. Ann. Supp. 1923, § 9516a), reads as follows:

"(b) All other marks not registerable under the Act of February 20, 1905, as amended, except those specified in paragraphs (a) and (b) of section 5 of that act, but which have been in bona fide use for not less than one year in interstate or foreign commerce, or commerce with the Indian tribes by the proprietor thereof, upon or in connection with any goods of such proprietor upon which a fee of $10 has been paid to the Commissioner of Patents and such formalities as required by the said Commissioner have been complied with: Provided, that trade-marks which are identical with a known trade-mark owned and used in interstate and foreign commerce, or commerce with the Indian tribes by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers, shall not be placed on this register."

The plaintiff registered its trade-mark or trade-name under the provisions of the act of 1920. That act is entitled:

"An act to give effect to certain provisions of the convention for the protection of trade-marks and commercial names, made and signed in the city of Buenos Aires, in the Argentine Republic, August 20, 1910, and for other purposes."

The purpose of Congress in its enactment is evident, when one considers it in the light of the report of the Senate committee on patents

to which the bill was referred. That committee, in recommending the passage of it, stated in its report:

"This legislation has no effect on the domestic rights of any one. It is simply for the purpose of enabling manufacturers to register their trade-marks in this country for the purpose of complying with legislation in foreign countries, which necessitates registration in the United States as a necessary preliminary for such foreign registration. As the law now stands, it enables trade-mark pirates in foreign countries to register as trade-marks the names and marks of the American manufacturers, and thus levy blackmail upon them." Report No. 432, 66th Congress, 2d Session.

This committee report is in accord with the views expressed by the Commissioner of Patents at a hearing on the bill. His statement may be found in the margin.[2]

But if the record does not disclose that the plaintiff has, at common law, a valid trade-mark or trade-name in the words "The Winchester," and did not obtain even a prima facie title to the use of the words as such a trade-mark or trade-name by their registration under the act of 1920, we must inquire whether those words have a secondary meaning which entitles the plaintiff to the relief which it seeks. It must be kept in mind that, if the words have attained such a secondary meaning, this would not make the trade-mark or trade-name valid at common law. This court said in Scandinavia Belting Co. v. Asbestos & Rubber Works, 257 Fed. 937, 951, 169 C. C. A. 87, that the fact that a geographic term has come to have a secondary meaning does not constitute it a valid trade-mark at common law. And the same thing

---

[2] "Now, to say that every mark that should be registered in South America should be registered here would upset all our ideas about what is a good trade-mark. So that in the discussions before the Senate committee a year ago, this thought was finally adopted and seemed to remove all of the trouble —that all marks that were received from South America, we would put them on a register here. This does not give them prima facie ownership. There is nothing in this bill that says that registration shall be prima facie evidence of ownership. * * * In fact, the only difference between the registration under this bill and the registration under the present statutes is that under the present statutes, when a man registers, he gets a prima facie ownership of the mark. Under this registration he does not, under the registration as provided for in H. R. 9023, he does not. Consequently, there would be no harm to any one, that I can see, in putting these marks on the register here and complying with this bill in all its provisions. It is true there will not be very much benefit received by those countries abroad by registering under this bill. * * * We are giving them about the same thing that they give us; but we do it by simply registering their marks here and allowing them to get their rights under the common law that we have in force regarding all trade-marks." Hearings on H. R. 9023, Government Printing Office, 1919.

During the Commissioner's exposition of the bill, the following occurred:

"Mr. MacCrate. Suppose a man comes to the bureau now and wants to register a name that suggests the article. Would you permit him to register it under this bill?

"Mr. Newton (Commissioner of Patents). We will under this bill, because we simply put it on the register. That is the keynote of the difference between this bill and the present trade-mark registration bill. The present trade-mark registration bill specifies what cannot be registered. You cannot register your name; you cannot register a descriptive word or geographical word—New York, Washington, etc.; you cannot register such words. But we may get those words to register from South America. We simply put those words on that register for what it is worth."

is true as respects a surname. In all such cases relief must be afforded, not on the ground of trade-mark, but upon that of unfair competition.

[4] A name or word which may not be entitled to protection as a valid trade-mark may, by long and exclusive use by one individual, acquire a secondary meaning as designating his goods, which will entitle him to protection against its use by any other person upon the ground of unfair competition. The law on this subject is established and was well stated in the Supreme Court by Chief Justice Fuller in Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 673, 21 Sup. Ct. 270, 274 (45 L. Ed. 365) where it was said:

"But it is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that, where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached. In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those and other goods, and protection is accorded against unfair dealing, whether there be a technical trade-mark or not. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. If a plaintiff has the absolute right to the use of a particular word or words as a trade-mark, then, if an infringement is shown, the wrongful or fraudulent intent is presumed, and, although allowed to be rebutted in exemption of damages, the further violation of the right of property will nevertheless be restrained. But where an alleged trade-mark is not in itself a good trade-mark, yet the use of the word has come to denote the particular manufacturer or vendor, relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense by such limitations as will prevent misapprehension on the question of origin. In the latter class of cases such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of."

As Lord Halsbury said in Reddaway v. Banham, [1896] A. C. 199, "Nobody has any right to represent his goods as the goods of somebody else." That principle of law underlies all the decisions in the cases involving unfair competition. Standard Paint Co. v. Trinidad Asphalt Co., 220 U. S. 446, 31 Sup. Ct. 456, 55 L. Ed. 536; Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Lawrence Manf. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997; McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828.

[5] The question whether or not one is selling or representing his goods as those of another is always a question of fact. And in Reddaway v. Banham, [1896] A. C. 199, 206, in the House of Lords, Lord Chancellor Halsbury, referring to Burgess v. Burgess, 3 D., M. & G., 896, and to what was said in that case by Sir George Turner, said:

"And Turner, L. J., I think most accurately says: 'It is a question of evidence in each case whether there is false representation or not.'"

[6] Has the trade-name of the plaintiff, used in connection with its sale of shirts or other articles of wearing apparel, attained a secondary meaning, so that it indicates to the public the plaintiff's goods? And

is this defendant, the Winchester Company, in selling in its retail "Winchester" stores shirts or other articles of wearing apparel with the mark "Winchester" affixed thereto, representing its goods to the purchasing public as the goods of the plaintiff, the Charles Broadway Rouss, Inc.? If it is, it is engaged in unfair competition. If it is not, then it is not carrying on its business in an unfair manner.

· In unfair competition the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. If the defendant in such a suit conducts its business in such a manner as not to palm off its goods as those of the complainant, the suit fails. Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 140, 25 Sup. Ct. 609, 49 L. Ed. 972. In Barton v. Rex-Oil Co., Inc. (D. C.) 288 Fed. 878, 882, it is said:

"But to establish as a fact that a trade-name, insufficient as a trade-mark, had acquired the secondary meaning claimed, something more is required than the sole possession of a limited field for a short time. The article bearing such trade-name must be almost universally known, and must have been in use long enough to have come to the knowledge and to have received the acquiescence therein of the public."

A witness employed by the plaintiff to manufacture its shirts testified as follows:

"Q. Did you ever know of any other concern selling a shirt marked 'Winchester'? A. No, sir; I don't know of any.

"Q. And you have been in the shirt business for 25 years? A. I was connected with the shirt business for 28 years.

"Q. Twenty-eight years? A. Yes.

"Q. Are you familiar with the shirt business outside of New York, all over this country? A. I know an awful lot of them.

"Q. The name 'Winchester' applied to a shirt—does that mean anything in the shirt business? A. That means it belongs to Charles Broadway Rouss.

"Q. That is, in that case it is a shirt put out by Charles Broadway Rouss? A. I know every big jobber in the country, and all the names and brands, and do work for a good many of them.

"Q. But none of them ever use 'Winchester'? A. No."

Another witness, also employed by plaintiff in the same capacity, testified as follows:

"Q. Now, in the shirt business, to your knowledge, does the name "Winchester' indicate the source of the Winchester shirts? A. Yes.

"Q. What does it indicate? A. It indicates that the Winchester was a shirt from Charles Broadway Rouss.

"Q. That is generally known in the shirt trade, to your knowledge? A. Yes.

"Q. Did you ever know of a shirt put on the market, not by Charles Broadway Rouss, which was marked 'Winchester'? A. No.

"Q. To your knowledge, no one else had ever used the word 'Winchester' on a shirt? A. No."

Another witness, also employed by plaintiff in the same capacity, said:

"Q. Your experience in the shirt trade—would that lead you to believe that the name 'Winchester' on a shirt indicates the source of supply of that shirt? A. Yes.

"Q. What does it indicate? A. That Charles Broadway Rouss is the seller.

"Q. During your experience in the shirt and nightshirt and pajama business, have you ever known of any shirt, nightshirt, or pajamas, bearing the

trade-mark 'Winchester,' that wasn't a Charles Broadway Rouss product? A. No, sir."

A witness who was employed by the complainant as a buyer of clothing testified:

"Q. How long have you been associated with Charles Broadway Rouss? A. I started in 1891, and I was away about 18 months in 1906 and 1907.

"Q. And except for that interval you have been with Charles Broadway Rouss since 1891? A. Yes, sir.

"Q. You have in charge the clothing department of that concern? A. Yes, sir.

"Q. Did Charles Broadway Rouss, during that period, sell clothing bearing a ticket marked with the name 'Winchester'? A. Yes, sir.

"Q. All during that period? A. Well, about 25 years.

"Q. Twenty-five years to your knowledge? A. Yes, sir.

"Q. What kind of clothing with the ticket 'Winchester' was sold by Charles Broadway Rouss? A. Well, he had overalls and work clothing, and for a while we manufactured custom-made clothing, under the label of 'Winchester Tailoring Company.'"

Another witness, and this one not in plaintiff's employ, testified:

"Q. Your business? A. Buyer for the J. C. Penny Company, a retail chain store organization.

"Q. The J. C. Penny Company, a retail chain store organization. How many stores are run by the J. C. Penny Company? A. 371.

"Q. Where are they located—what states? A. Every state in the Union, except four or five Southern states, Georgia, Alabama, Mississippi, Kentucky, and Tennessee. Every state west of the Mississippi river. * * *

"Q. Did you have any knowledge of Charles Broadway Rouss Winchester shirts before you became connected with the Penny Company? A. Yes, sir; that was one of my competitors. I was in that business.

"Q. So you have known of the Charles Broadway Rouss Winchester shirts? A. Yes; for the last 8 or 10 years.

"Q. Now, during that period, did you ever hear of any other shirts by the name of Winchester, except those put out by Charles Broadway Rouss? A. That is the only shirt I knew of put out under that label.

"Q. That is all. Let me ask one more question. What does the name 'Winchester' on a shirt indicate in the shirt trade?

"Mr. Rockwell: Objected to on the ground that the witness hasn't shown familiarity with the shirt trade. * * *

"The Witness: I have been in the shirt business for 18 years. * * *

"The Court: You may answer the question.

"The Witness: Yes; if we are getting orders for Winchester shirts, we would go to Rouss to get them, as that would be the only thing we would know to do."

It is to be observed that no one of the witnesses called by the plaintiff represented the consuming public, and no witness who gave testimony stated that he had ever purchased, or knew of any one who had purchased, a shirt or any other article of wearing apparel, marked "Winchester" and sold by the defendant, who had made the purchase thinking that he was buying the plaintiff's product. There is no evidence in the record that any one of the consuming public has been misled by this defendant, directly or indirectly.

Among the witnesses called on behalf of the defendant was a witness who, at the time and for a year prior to the giving of his testimony, was employed by the defendant. He had had both in New York and in Boston a wide experience as a buyer for large concerns dealing

in men's furnishings. Among others, he had been employed for 8 years as a buyer for Abercrombie & Fitch, one of the largest of such dealers in the city of New York. He testified as follows:

"Q. Are you familiar with the line of 'Winchester' branded shirts sold by Charles Broadway Rouss? A. Never heard of them until this case came up.

"Q. Their goods are not sold by Abercrombie & Fitch? A. No, sir; not while I was with them, over 8 years. * . * *

"Q. Could [you] not state what the word 'Winchester' means on a shirt of the type you sell? ·

"Mr. Anderson: I object, your honor.

"The Court: He may answer.

"A. It would convey the fact that it was purchased from the Winchester store.

"Q. That is the only shirt of that class, is it, sold under the name 'Winchester'? A. What do you mean, 'only shirt of that class'?

"Q. Well, I have here in my hand Exhibit Z–5. In a class of that kind, is that the only "Winchester' shirt with which you have come in contact? A. Yes; I have never seen the 'Winchester' shirt, other than those carried by Winchester Stores.

"Q. In that line of shirts, have you ever seen the word 'Winchester' displayed in any other than that slanting form of letter? A. No."

Another witness, who had had a wide experience in New York and Boston as a salesman of men's furnishings, and who never had any connection with the defendant, testified as follows:

"Q. How long experience have you had dealing with shirts? A. In buying and selling shirts in New York and Boston since 1902. I had 6 years in Canada before that in men's furnishing game, selling. * * *

"Q. You were with Stearns & Co., Boston, Mass. They have a department store? A. General men's and women's store.

"Did they sell any shirts of Charles Broadway Rouss under the brand 'Winchester'? A. Never; not while I was with them.

"Q. Did John David sell any? A. Not while I was with them. * * *

"Q. Have you ever seen Charles Broadway Rouss shirts under the brand 'Winchester'? A. Never."

Another witness, employed by defendant since 1920, but who had experience as a salesman for 25 years, testified as follows:

"Q. Did you ever do any traveling in connection with your business? A. Twenty years, Middle West and Northwest.

"Q. What were you doing? A. Selling.

"Q. What merchandise? A. General line of men's wear, including shirts, neckwear, hosiery. * * *

"Q. In your experience you have had to do, I take it, with shirts all running in a similar class as to style and material? Is that correct? A. Yes.

"Q. Have you come in contact with the consumers, the wearers, of shirts of that kind? A. I have.

"Q. That is, in direct contact with the consumer? A. I have.

"Q. Can you state what label with the name 'Winchester' means on a shirt of that particular character I am speaking of?

"Mr. Anderson: Your honor, I object to that as immaterial and irrelevant.

"The Court: Admit it.

"A. It means a shirt bought at a Winchester store.

"Q. A store of the Winchester Company? A. The Winchester Company.

"Q. In your experience with shirts of that line, have you ever sold any shirts of Charles Broadway Rouss? A. Never.

"Q. Have you competed, when you were selling shirts, with any sellers of Charles Broadway Rouss shirts, so far as you know? A. Not so far as I know.

"Q. Have you met with Charles Broadway Rouss shirts marked 'Winchester' in your experience in the shirt business? A. Not until about 10 days ago; since this suit was started was the first time I ever heard of the Charles Broadway Rouss shirt.

"Q. You mean Charles Broadway Rouss shirt, or Charles Broadway Rouss 'Winchester' shirt? A. Any shirt made by Charles Broadway Rouss."

We have no doubt, however, that the defendant has built up a very considerable business for the sale of its Winchester shirts. The record contains a statement made by the head of the plaintiff's shirt department which shows a sale of "Winchester" shirts from 1897 to the end of September, 1922, amounting approximately to the sum of $5,000,-000. The following is an excerpt from the record:

"Q. What is the—roughly, I mean, what is the—amount of business annually done by Charles Broadway Rouss? A. It will average, over the last 20 years, about $8,500,000.

"Q. In each year? A. Yes.

"Q. What is the territory covered by the business of Charles Broadway Rouss? Where does it ship its merchandise? A. To every state in the Union, and we export goods to foreign countries."

During that period no one excepting the plaintiff, or its predecessor in title, used the name "Winchester" in connection with similar merchandise, with the exception of a single shirt manufacturer in Philadelphia, against whom a decree was obtained. At the time the plaintiff began to use its trade-name "The Winchester" upon its shirts, the Winchester Company was not in existence, and the Winchester Repeating Arms Company, although it had at that time existed for about 33 years, had not then or since made or sold shirts; and while its trade-name of "Winchester" was known throughout the world, it was known only in connection with the sale of guns and ammunition. We think, therefore, that the plaintiff had the right to use the word in connection with the sale of shirts when it began so to use it in 1900, which was almost 20 years prior to its use in a similar connection by the defendant Winchester Company. We shall assume, for the purpose of the argument and without deciding it, that when the latter began to use the trade-name in connection with shirts the trade-name as used by the plaintiff on its shirts had acquired a secondary meaning, and the plaintiff was then entitled to be protected in its use, as against any unfair competition.

But the extent of the protection which can be accorded as against this defendant is another matter. We are satisfied that those who incorporated the Winchester Company did so in perfect good faith, and not for the purpose of injuring in any way this plaintiff. It does not appear that they at that time, or at the time when the trade-name was used on shirts, knew of the plaintiff's existence, or that the plaintiff made use of the name "Winchester" on the shirts it sold. The new products sold by the Winchester Company, as distinguished from the products manufactured and sold by the Winchester Arms Repeating Company, can only be bought in the stores of the Winchester Company, and in which they handle mainly sporting goods. This is an excerpt from the testimony of the general manager of those stores:

"Q. By what organization is the sale of those products controlled? A. By the agency dealers of the Arms Company and the Winchester owned stores.

"Q. Winchester owned stores. You mean stores of the Winchester Company? A. That are owned by them; Yes, sir.

"Q. The Winchester's retail stores? A. Yes, sir.

"Q. And by these dealers who have contracts with the Repeating Arms Company? A. We call those agency dealers.

"Q. Can't you obtain those goods at other places than at those dealers? A. No, sir.

"Q. Well, won't you state briefly what arrangement is made in that respect? A. The sales policy of the Winchester Repeating Arms Company is to appoint special agency dealers in various towns, to which they will sell their so-called new products. Only the Winchester stores are able to buy them, and the agencies and the stores are the only people who can obtain these. The guns and ammunition are sold through the old channels, the jobbing channels, but the new products are not.

"Q. And the public could not buy those new products, generally speaking, without going to a store of the Winchester Company, or any agency store, is that correct? A. That is correct."

All products sold by the defendant are guaranteed by both the Winchester Company and the Winchester Repeating Arms Company, and all the stores of the Winchester Company in which these products of that company are sold are conspicuously marked by the word "Winchester" with the characteristic and distinctive type of lettering heretofore set forth:

"Q. Is the store marked in any special way on the outside, or on the show windows, that you recollect? A. All our stores are marked with our trademark, which is similar to this mark here. We carry that on top of our stores, on our window returns; have it on our door mats, all in this characteristic, distinctive type of lettering.

"Q. Now, you have spoken about signs over the doors. Is this sign here at your left—does it show about the form in which it appears over the door fronts? A. That shows the form, but not the size.

"Q. What is the difference? A. The main 'Winchester' over the door would run from 12 to 15 feet long. They are much larger than this, and we have smaller 'Winchester' on the window return. On the entrance we would have a sign approximately that size in the door mat, all made in the same characteristic 'Winchester.'

"Q. What is the idea in displaying that in that way? A. That is our trademark. It is our signature, and wherever 'Winchester' appears we write it that way."

The defendant uses for the name "Winchester," as we have previously stated, a special form of staggered lettering. This is an excerpt from the record:

"The Witness: There is a special form of staggered lettering, a peculiar lettering, which has, so far as I know, been used almost uniformly throughout. I don't know of any other company using that.

"Q. That is very often red? A. That is very often red; yes."

The appearance of this lettering is shown in another part of this opinion; and, referring to the use of the word by the Winchester Repeating Arms Company, the court said at the hearing:

"On every possible occasion, whenever there was a possible opportunity to put the word in, they did so. They marked everything in the package on the outside, so that it went all over the world, so that this staggered word 'Winchester' appears in myriads of ways on every possible opportunity."

And this counsel for the plaintiff seemed to concede. This staggered lettering, it was admitted, went at least as far back as 1901.

It appears never to have been used by any one else; and it is compulsory on every manager of a store of the Winchester Company to run that form of advertising in each Winchester advertisement. A witness, who had charge of the advertising of the Winchester Repeating Arms Company, and who checked all the bills for advertising, testified:

"Q. You checked all the bills? A. Yes.

"Q. Won't you state what the average was per year for advertising this particular form of the word 'Winchester'? A. It used to run around a quarter of a million dollars.

"Q. A quarter of a million dollars per year would be a fair average? A. Yes.

"Q. For how many years? For the length of time I was there, for 19 years."

And for the last few years the amount spent in advertising the word has averaged $300,000 a year. The testimony discloses that the Winchester Repeating Arms Company was known all over the world, and as long ago as the late '60's it was known to the public as "Winchester." And the court said:

"We have always heard of Winchester's, and the word 'Winchester' is an old familiar name. The corporation was started by old Oliver Winchester. That is all conceded."

As these goods can only be purchased in a Winchester store, and both the store and the goods are so distinctively and conspicuously marked, it is hardly conceivable that any one entering such a store and making the purchase so marked is misled into thinking that he is buying the goods of the plaintiff. The general manager of the plaintiff's store was asked, on his direct-examination, "What is the business of Charles Broadway Rouss?" He answered, "Wholesale dry goods, notions, and general store supplies." On the cross-examination he testified as follows:

"Q. Do they sell any goods at retail? A. Yes, sir.

"Q. Well, then, it is a wholesale and retail house? A. Yes; we don't do business of any other nature, because you can't buy less than an original package."

He also said:

"We sell a lot of merchandise in the city, but our business lies principally with the small country merchants.

"Q. How often do you get out catalogues? A. Every 30 days.

"Q. How long has that practice continued? A. The first issue of the catalogue was in—it has been done for 47 years."

If the principal part of the plaintiff's business is with the small country merchant, who is familiar with the plaintiff through the plaintiff's catalogues, gotten out every 30 days, the plaintiff's chief appeal is to a different public from that to which the defendant appeals. The stores which the defendant maintains are retail stores, and it maintains altogether only seven or eight such stores. In addition to the one in New York City, there are two in Boston, and one each in New Haven, Providence, Pawtucket, and Troy. These stores, outside of New York, do not interfere with either the wholesale or retail trade of the plaintiff's store in New York. They do not interfere with the wholesale trade which the plaintiff carries on with "country merchants," and

300 F.—46

which constitutes the principal part of the plaintiff's business, because they do not engage in the wholesale business; and they do not interfere with the retail business of the plaintiff, because they reach their own local public, which is a different public from that which the plaintiff sells to in New York.

The plaintiff carries on in New York City such retail business as it does in its store on Broadway. It does not appear that its "Winchester" shirts are sold in any other store in that city. Its business is carried on under the name of Charles Broadway Rouss, Inc., and that name is prominently displayed on the front of its store. The defendant carries on its retail business in New York City in its store on Forty-Second street, and its name, the "Winchester Store," is not only prominently displayed on the front of the store, but also on the window returns, and even on the door mat. It not only does not seem probable, but, on the contrary, appears quite improbable, that one wishing to purchase "The Winchester" shirt, sold by the plaintiff, would enter a Winchester Store, known to be a sporting goods store, and one in which the well-known Winchester firearms and ammunition and other products of the Winchester's are prominently displayed and sold, and expect to find therein the shirt sold by the plaintiff.

The defendant is not even open to the suspicion that, in adopting its corporate name or its trade-name, which it affixed to shirts, its purpose was to appropriate to itself any of the good will attaching to the plaintiff's business in shirts. It does not appear that, when defendant company placed its name on the shirts it sold, it had any knowledge of the plaintiff's existence, or of the fact that it was selling shirts with the name of "The Winchester" attached thereto. Under these circumstances, the defendant has the same right to make use of its name in carrying on its business that an individual would have under like conditions. And in Coty, Inc., v. Parfums de Grand Luxe, Inc., 298 Fed. 865, recently decided in this court, we had occasion to point out that a man's name is his own property, and that he has the same right to its use and enjoyment as he has to that of any other species of property, but that he cannot use it in carrying on his business in a manner which invades the rights of others.

It being established that the plaintiff's trade-name, "The Winchester," has been used in connection with the sale of its shirts for so long a time and so extensively throughout the United States that it has acquired a secondary meaning, and that it had such meaning when the defendant came into the field with its shirts, we think that the plaintiff, on the strength of its having been first in the field, and having first made use of its mark, and having established for it its secondary meaning, has a right to insist that the defendant, which has come later into the same field with the sale of its shirts, shall take such reasonable precautions as are commercially practicable and necessary to prevent any unlawful diversion to it of the plaintiff's custom. This makes it necessary to consider whether the manner in which the defendant is conducting its business is, under all the circumstances, such as is likely to mislead the public and defraud the plaintiff.

[7] It is not important that the plaintiff does not himself manu-

facture the articles which he sells and upon which he places his trademark. It is sufficient that the goods are manufactured for him, and that he owns or controls the goods which he offers for sale, and upon which he places his trade-mark or trade-name. McLean v. Fleming, 96 U. S. 245, 253, 24 L. Ed. 828; C. A. Briggs Co. v. National Wafer Co., 215 Mass. 100, 104, 102 N. E. 87, Ann. Cas. 1914C, 926.

[8] It is not necessary to show, in a case of unfair competition, that particular customers have been deceived in order that a plaintiff may recover. Kaufman v. Kaufman, 223 Mass. 104, 107, 111 N. E. 691. But it must appear that deception will be the natural and probable result of the defendant's acts. Florence Mfg. Co. v. Dowd, 178 Fed. 73, 101 C. C. A. 565; National Water Co. v. O'Connell (C. C.) 159 Fed. 1001, affirmed 161 Fed. 545, 88 C. C. A. 487; Bickmore Gall Cure Co. v. Karns, 134 Fed. 833, 67 C. C. A. 439; Enterprise Mfg. Co. v. Landers, 131 Fed. 240, 65 C. C. A. 587; Gannert v. Rupert, 127 Fed. 962, 62 C. C. A. 594.

[9] The essence of the wrong in unfair competition is that the defendant is palming off its goods as the merchandise of another. If the defendant so conducts its business as not to palm off its goods as those of the complainant, the suit fails. Armour & Co. v. Louisville Provision Co. (D. C.) 275 Fed. 92, 101; Auto-Acetylene Light Co. v. Prest-O-Lite Co. (C. C. A.) 264 Fed. 812; O. & W. Thum Co. v. Dickinson, 245 Fed. 613, 158 C. C. A. 37; Samson Cordage Works v. Puritan Cordage Mills, 211 Fed. 608, 128 C. C. A. 203, L. R. A. 1915F, 1101; De Voe Snuff Co. v. Wolff, 206 Fed. 423, 124 C. C. A. 302; Edward Hilker Mop Co. v. United States Mop Co., 191 Fed. 613, 618, 112 C. C. A. 176; Rathbone, Sard & Co. v. Champion Steel Range Co., 189 Fed. 30, 31, 110 C. C. A. 596, 37 L. R. A. (N. S.) 258.

[10] There can be no unfair competition, unless the plaintiff is in fact a rival in the particular territory for the trade which the defendant secures therein. Where a plaintiff has established a trade-name which is not strictly a trade-mark, as indicating that goods bearing it are put upon the market by him, he is entitled to protection against unfair competition in its use by others only within the territorial boundaries where he has established his trade-name by actual commercial transactions, and not outside that territory. Kaufman v. Kaufman, 223 Mass. 104, 106, 107, 111 N. E. 691. And see the decision of this court in Thomas J. Carroll & Son Co. v. McIlvaine & Baldwin, 183 Fed. 22, 28, 105 C. C. A. 314, affirmed 171 Fed. 125. But the testimony shows that the plaintiff sells "Winchester" shirts over the entire United States, and that it has been engaged in the sale of such shirts for 25 years.

It is to be kept in mind that this defendant is not engaged in the wholesale trade, and that its goods are only sold in its own stores, which it maintains in a very few places, and that those stores are so characteristically designated that any intelligent person who enters them knows that they are the stores maintained by the Winchesters— a concern known throughout the world, and so known before this plaintiff, or its predecessor in title, began its business. A careful examination of the record satisfies us that the allegation in the bill of

complaint is untrue that the defendant fraudulently adopted the word "Winchester," for the purpose of inducing the public to purchase its shirts and other articles in the belief that it was buying shirts and other articles placed on the market by the plaintiff. There is no evidence that, in adopting that name for its shirts and other merchandise, it did so, as is alleged, designedly, willfully, and for the purpose of defrauding and misleading the public into purchasing and using the defendant's shirts under the mistaken belief that the same were those of the plaintiff.

Moreover, there is no evidence in the record that, at the time the defendant began to use the trade-name in connection with its shirts and other articles, it had any knowledge that the plaintiff was using the word "Winchester" on the shirts or other articles, or that it even knew of the existence of the plaintiff. Neither is there anything in the record which so much as suggests that the defendant ever knew of the plaintiff's existence prior to June 19, 1922, when the latter wrote a letter to the defendant, informing it that the plaintiff claimed an exclusive right to use the trade-mark "Winchester" in connection with the sale of shirts.

While many cases hold that, in suits for unfair competition, an actual fraudulent intent on the part of the defendant to pass off his goods as those of the plaintiff must be shown, we have recently expressed the opinion that an actual fraudulent intent need not be shown, where the necessary and probable tendency of the defendant's conduct is to deceive the public, and pass off his goods as and for that of the plaintiff. See Coty, Inc., v. Parfums de Grand Luxe, Inc., supra, decided at this term. We are satisfied, after a careful scrutiny of this record, not only that no actual fraudulent intent on the part of the defendant has been shown, but that the necessary and probable tendency of the defendant's conduct is not such as to deceive the public, and enable it to pass off its goods as those of the plaintiff's. That being so, the defendant is not engaged in unfair competition.

Decree reversed.