**CURTIS–STEPHENS–EMBRY CO., Inc. v.
PRO–TEK–TOE SKATE STOP CO.,
Inc. et al.**

No. 14419.

United States Court of Appeals
Eighth Circuit.

Oct. 24, 1952.

408

Joshua R. H. Potts, Chicago, Ill. (Fred B. Whalen, James R. O'Connor, St. Louis, Mo., Potts & Brune, Philadelphia, Pa., on the brief; Basel H. Brune and John A. Robertson, Philadelphia, Pa., of counsel), for appellant.

Lawrence H. Cohn, St. Louis, Mo., for appellees.

Before SANBORN, JOHNSEN, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Plaintiff sought to restrain defendants' use of the trade-mark "Pro-Tek-Toe". The use of the latter mark was claimed to be an infringement of plaintiff's trade-mark "Pro-Tek-Tiv". The trial court dismissed plaintiff's complaint. The primary question now involved is whether the evidence supports the finding that plaintiff's trade-mark "Pro-Tek-Tiv" had not acquired a secondary meaning.

Plaintiff manufactures shoes. Its plant is located at Reading, Pennsylvania. It has sold these shoes extensively in many parts of the United States under the trade-mark "Pro-Tek-Tiv" since 1937. It registered its trade-mark May 7, 1940, under the Act of March 19, 1920, for leather shoes for babies, children and growing girls. Again, on November 14, 1950, upon its application dated October 14, 1949, it was granted registration of the same trade-mark on the Principal Register under the Trade-Mark Act of July 5, 1946, 15 U.S.C.A. § 1051 et seq., for men's, women's and children's shoes, made of leather, kid, fabric, and kindred materials, in Class 39, Clothing. The complaint in the present action was filed February 6, 1950.

Plaintiff has advertised its shoes extensively under the trade-mark "Pro-Tek-Tiv" from 1937 until the present time. From 1937 to date, total expenditures for such purposes have been more than $264,000.00. Its business has grown in annual sales from 32,587 pairs of shoes in 1940 to 350,904 in 1950, with a total for all of that period of 1,992,998. Its total sales volume for the entire period has been $7,972,000. All of its sales are at wholesale to retail outlets. Its method of advertising has been in newspapers and magazines, both national, in which no local dealer's name was mentioned, and local, in which particular dealers were mentioned and for which plaintiff and the local dealers shared the expense. In addition to those forms of advertising, circulars and letters were used. Plaintiff's assistant secretary and its assistant treasurer and advertising manager testified in detail concerning the extent of advertising activities, the territory covered, the nature of the advertising and the methods used in carrying on the business. Each stated the opinion that the name "Pro-Tek-Tiv" had become so well known as denoting the product of plaintiff

that it had acquired a secondary meaning as such and that any name confusingly similar would be associated with the plaintiff company as denoting its product.

The defendant company was formed in October, 1947, under the name Pro-Tek-Toe Skate Stop Company, Inc., for the purpose of the manufacture and sale of a rubber shield for protecting the toe of a roller skate shoe. It named its product Pro-Tek-Toe Skate Stop. Its utility is to protect the toe of the shoe when the toe is used as a brake when skating. Its place of business was at St. Louis, Missouri, but it has recently moved to Waynesville, Missouri, approximately 135 miles from St. Louis. In 1948 defendants began the manufacture and sale of a second product, consisting of a liquid preparation for use in stretching tight shoes, which was sold under the name Pro-Tek-Toe SHU-EEZ to shoe repair shops. This item was not profitable and it was discontinued in December, 1949. Defendants used the trade names Pro-Tek-Toe, Inc., and Pro-Tek-Toe Rubber Company for a short time in their advertisements, letterheads, and labels.

Defendants' product is sold only through sporting goods stores, roller skating rinks, and shoe repair shops, and is never sold direct to consumers. The defendant company is almost completely owned by Mr. Klein, who testified that he and his father conceived the name "Pro-Tek-Toe" without knowledge of the existence of plaintiff's trade-mark. On September 19, 1949, plaintiff notified defendants to cease using the trade-mark "Pro-Tek-Toe". The notice was disregarded. On November 17, 1949, defendants applied for registration of the trade-mark "Pro-Tek-Toe" under the Act of July 5, 1946. Registration was refused. It appeared from defendants' evidence that plaintiff's shoes were not sold locally in St. Louis or the surrounding trade territory, and that defendants did not know of plaintiff's trade-mark until they received the notice to discontinue the use of "Pro-Tek-Toe". Over plaintiff's objection, defendants introduced in evidence a directory of leading trade names and trade-marks from "Thomas Register of American Manufacturers", 40th Ed., 1950, Vol. 3, containing a list of 147 trade-marks derived from the word "Protect", which showed a common and widespread use in industry of the word "Protect" and variants thereof as names for various kinds of articles and showed a practice of separating the syllables. The date of this publication was, as above indicated, 1950. There was no indication from the publication how long or how general the use of the trade-marks and trade names listed had been.

Also over plaintiff's objection, trade-mark registrations were received in evidence for the following marks and uses:

"Protector", by the International Shoe Co., St. Louis, Missouri, December 22, 1925, renewed December 22, 1945, reciting that it had been continuously used by registrant for men's shoes of leather since 1908,—under the Act of February 20, 1905;

"Protexu", by Arthur A. Williams, Holliston, Mass., August 20, 1929, renewed August 20, 1949, reciting that it had been continuously used for and applied to leather shoes for industrial workers since August, 1926,—under the Act of February 20, 1905;

"Protekshoe", by Mississippi Valley Last Company, St. Louis, Missouri, October 2, 1945, reciting that it had been used and applied to shoe trees since March 11, 1943,—under the Act of February 20, 1905;

"Shuprotek", to Fern Dell Gamble, Los Angeles, California, March 1, 1938, reciting its continuous use for and application to shoe mitts made of elastic fabric, intended for wear over shoes while driving an automobile, since July, 1936,—under the Act of March 19, 1920;

"Protek-Shu", by Marie C. Palmer, Chicago, Illinois, September 13, 1938, reciting that it had been continuously used for and applied to shoe-covers intended to be worn over shoes, since March 9, 1936,—under the Act of March 19, 1920;

"Pro-Tec", by The New Mode Infants Wear Co., Inc., of New York, June 27, 1944, reciting that it had been continuously used for and applied to baby buntings,

sleeping bags, robes, and vestees, since November, 1940,—under the Act of March 19, 1920;

"The ProtexArch", by The Holters Company, of Cincinnati, Ohio, October 11, 1921, renewed October 11, 1941, reciting that it had been used by the applicant since February 15, 1921, for men's, women's, and children's shoes made of leather, fabric, and combined leather and fabric,—under the Act of February 20, 1905;

"Dr. Hall's Protective Arch", by The J. K. Orr Shoe Company, of Atlanta, Georgia, December 18, 1928, reciting its continuous use since November 1, 1927, for leather, fabric, and combined fabric and leather shoes,—under the Act of February 20, 1905.

The trial court's theory of the case is stated in a letter addressed to defendants' counsel as follows:

"I have decided to enter judgment for the defendants in the above-styled case on the ground that no secondary meaning has been established.

"Please prepare Findings of Fact, Conclusions of Law and a separate Judgment."

Findings were prepared and filed that defendants manufactured a stopping or brake appliance made of rubber, for use by roller skaters, designed for attachment to the forward part of the skate shoe and when so attached provided a guard or shield for the toe of the shoe; that it was sold under the name "Pro-Tek-Toe" through sporting goods stores, shoe repair shops and roller skating rinks; that on May 7, 1940, a certificate of Trade-Mark Registration No. 377,682 issued to plaintiff under the Trade-Mark Act of March 19, 1920, for the name "Pro-Tek-Tiv", for leather shoes for babies, children and growing girls; that on November 14, 1950, certificate of Trade-Mark Registration No. 533,473 issued to plaintiff for the name "Pro-Tek-Tiv" for men's women's, and children's shoes made of leather, kid, fabric, and kindred materials, and that "such registration [was] effected under the pro-visions of Section 2(f) of the Act of July 5, 1946"; that "The mark Pro-Tek-Tiv is the full equivalent of 'protective,' and as such is merely descriptive of plaintiff's goods. The word 'protect' in various forms and spellings has been used as trade marks by a large number of concerns. Thomas Register of Leading Trade Names and Trade Marks, 1950 Edition, lists one hundred forty-seven (147) instances of such use. Closely similar words are registered in the Patent Office, including the words 'Protector' and 'Protexu', for leather shoes"; that "The Trade-Mark Act of 1946 provides that words which are merely descriptive of the goods to which they are applied are not registrable on the Principal Register, unless such mark has become distinctive of the user's goods in commerce, or, otherwise stated, unless the mark has acquired a secondary meaning"; that "The mark Pro-Tek-Tiv has not become distinctive of plaintiff's goods in commerce, and such mark has not acquired a secondary meaning"; that "The goods on which the terms Pro-Tek-Tiv and Pro-Tek-Toe are used by the respective parties are substantially different and such goods reach the public through different retail channels. There is no evidence of confusion, mistake or deception of purchasers or the likelihood thereof"; that "Defendants' use of its mark Pro-Tek-Toe does not infringe any trade-mark rights of plaintiff"; that "Plaintiff has failed to sustain the allegations of unfair competition."

The conclusions of law state:

"Plaintiff trade mark Registration No. 533,473 of November 15, 1950, issued under Section 2(f) of the Act of 1946 is invalid on the grounds that the mark is merely descriptive of the goods and has not acquired a secondary meaning, or become distinctive as applied to plaintiff's goods.

"Since plaintiff has failed to establish a secondary meaning in the mark Pro-Tek-Toe,[1] its ownership of that mark under the 1920 Act, Registration No. 377,682, is not established.

---

1. Should be—"Pro-Tek-Tiv".

"Defendants' use of the name Pro-Tek-Toe for skate stops and leather stretching liquid composition does not infringe any trade-mark right held by plaintiff.

"The defendant is entitled to a judgment dismissing the Complaint, together with its costs."

The judgment held plaintiff's registration of November 15, 1950, invalid, recited that plaintiff had failed to prove its allegations of trade-mark infringement or unfair competition, denied an injunction and accounting, and dismissed the complaint.

Plaintiff's contentions on this appeal are (1) that the evidence established a distinctive and secondary meaning of plaintiff's trade-mark "Pro-Tek-Tiv"; that the court erred (2) in holding that "Plaintiff's trademark Registration Number 533,472 of November 15, 1950, issued under section 2(f) of the Act of 1946 is invalid on the grounds that the mark is merely descriptive of the goods and has not acquired a secondary meaning, or become distinctive as applied to plaintiff's goods"; (3) in holding that "Since Plaintiff has failed to establish a secondary meaning in the mark Pro-Tek-Tiv, its ownership of that mark under the 1920 Act, Registration No. 377,682 is not established"; (4) in holding that "Defendants' use of the name Pro-Tek-Toe for skate stops and leather shoe stretching liquid composition does not infringe any trade-mark right held by plaintiff"; (5) in holding that "Plaintiff has failed to prove its allegations of Unfair Competition"; (6) in admitting in evidence the Register of Trade-Names and Trade-Marks and the eight copies of registrations summarized above.

Before alluding specifically to the grounds urged for reversal, it will be of advantage to establish the general principles of the law of trade-marks applicable to the present controversy. Generally speaking, trade-marks are divided into two broad classifications, (a) the technical marks which are distinctive in themselves, exclusively appropriated for and understood to indicate that goods bearing that mark are those of a particular manufacturer, and not descriptive of the character or quality of those goods, Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 335, 59 S.Ct. 191, 83 L.Ed. 195; Thaddeus Davids Co. v. Davids, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; and (b) marks which are primarily descriptive of the goods to which they are applied but which have been used long and extensively enough to have become known and understood by the public as applying to the goods of the manufacturer and denoting that all goods bearing the mark are the goods of that particular manufacturer. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369; Rouss v. Winchester Co., 2 Cir., 300 F. 706. These latter marks are for convenience, more than for reasons of meticulous accuracy, said to be marks having a secondary meaning, i. e., that they no longer refer primarily to the goods they describe but have, for the reasons just stated, come to refer primarily to the maker of those goods. Merriam Co. v. Saalfield, supra. The technical marks were subject to exclusive appropriation under the common law, and were made the subject of registration by Acts of Congress in the Patent Office. Thaddeus Davids Co. v. Davids, supra. Descriptive words, lacking the distinctiveness of applying only to the producer of goods, were not eligible to become trade-marks under the common law. Beckwith's Estate, Inc., v. Commissioner of Patents, 252 U.S. 538, 40 S.Ct. 414, 64 L.Ed. 705. And words of description, absent a secondary meaning, have always been free to the use of anyone to describe the quality and character of his product. Merriam Co. v. Saalfield, supra; Beckwith v. Commissioner of Patents, supra. But Congress has by legislation made not only the technical marks, good under the common law, but also those which are descriptive but which have in addition come to possess primarily the secondary meaning referred to, subject to registration under the law as trade-marks and entitled to the protection which the statutory law has provided. Thaddeus Davids Co. v. Davids, 233 U.S. 461, 470, 34 S.Ct. 648, 58 L.Ed. 1046. Both the statutory and the common law of trade-marks are products of the

necessity to protect one from the unfair competition of another, hence it is said that the law of trade-marks, both common law and statutory, is but part and parcel of the broader law of unfair competition. American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317. The necessity to protect one who has adopted a mark descriptive of his product as the insignia of his business, and by long or extensive use and great effort has made it such, from the use of that mark by another for the purpose of palming off the other's goods as those of the former, furnishes the reason that the statute law of trade-marks was broadened to encompass descriptive marks within its protection. Thaddeus Davids Co. v. Davids, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046. But in doing so the statute has placed certain requirements upon the registrant before he might register his mark. The Act of 1905, 15 U.S.C.A. § 81 et seq., among other things required that when a mark was proffered for registration, which was descriptive, it had to be shown that it had been in "actual and exclusive use" as a trade-mark of the applicant or his predecessor over ten years next preceding the passage of the Act. 15 U.S.C.A. § 85. The Act of 1920, 15 U.S.C.A. § 121 et seq., was passed primarily for the purpose of enabling American and foreign users of trade-marks to register them in accordance with the provisions of the convention for the protection of trade-mark and commercial names, signed at Buenos Aires in 1910.[2] Under Sec. 121(b) of the Act of 1920, quoted in Rouss v. Winchester, 2 Cir., 300 F. 706, 713, a mark was made subject to registration, although descriptive, which had only been in bona fide use by the applicant for not less than one year in interstate or foreign commerce, without any showing that the mark had acquired a secondary meaning. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S.

315, 334, 59 S.Ct. 191, 83 L.Ed. 195; Rouss v. Winchester Co., 2 Cir., 300 F. 706, 713. Registration under the Act of 1920 conferred no substantive rights.[3] Registration under it was not made prima facie evidence of "ownership",[4] as was true under the Act of 1905. Although the Act of 1920 conferred the right of action for infringement on an "owner" of a mark, ownership was not established by registration but could only be established by proof of secondary meaning. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 335, 59 S.Ct. 191, 83 L.Ed. 195. Hence, under the Act of 1920 unless a secondary meaning was proved there was no right of action under it for infringement. All rights given by registration under the Act of 1920 were preserved and carried forward by the Act of July 5, 1946, effective July 5, 1947, also known as the Lanham Act, 15 U.S.C.A. § 1051 et seq. The purposes and effect of the Act of 1946 are manifold. It puts all existing trade-mark statutes in a single piece of legislation; it carries out by statute our international commitments; it seeks to modernize trade-mark statutes to conform to legitimate present-day business practices; it undertakes to remedy inaccurate constructions of prior Acts; and in general it seeks to simplify trade-mark practices, secure to trade-mark owners the good will they have built up under their trade-marks and protect the public from imposition. Commentary on The Lanham Trade-Mark Act, 15 U.S.C.A. p. 265.

Under the Act of 1946 all registrations under the Act of 1920 have been placed in a Supplemental Register. Registration under the Act of 1946 does not require proof that the mark had been in the actual and exclusive use of the applicant as his trade-mark for ten years, as was required by the Act of 1905. In lieu of the ten-year requirement of actual and exclusive use, five years of "substantially

2. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 323, 59 S.Ct. 191, 83 L.Ed. 195.

3. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195.

4. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195; Rouss v. Winchester Co., 2 Cir., 300 F. 706, 712.

exclusive and continuous use" next preceding the date of the filing of the application is required. 15 U.S.C.A. § 1052(f). Since the Supreme Court in Thaddeus Davids Co. v. Davids, 233 U.S. 461, 466, 34 S.Ct. 648, 58 L.Ed. 1046, in construing the Act of 1905 said that the prerequisite to registration under that Act of ten years previous exclusive use of the mark was deemed adequate by the Congress to insure that a descriptive mark having that qualification possessed a secondary meaning, it must follow that Congress in establishing the new and different prerequisite of five years of *substantially* exclusive and continuous use in the Act of 1946 now deems that period of such use adequate to insure that a mark having the latter qualifications has become possessed of a secondary meaning. Under the Act of 1946 a mark may not be registered if it so resembles a mark registered in the Patent Office, or a mark previously used in the United States by another than the applicant and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers. 15 U.S.C.A. § 1052(d). By subsection (b) of Sec. 7 of the Act of 1946, 15 U.S.C.A. § 1057(b), a certificate of registration of a mark on the principal register is made prima facie evidence of the validity of the registration, the registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods specified in the certificate, subject to any conditions and limitations stated therein.[5] Therefore, when a mark is registered upon the principal register under the Act of 1946, the presumption arises that the statutory prerequisites to its valid registration have been met, i. e. (1) its dissimilarity to other registered marks for similar goods, (2) its secondary meaning, (3) its "ownership" by the applicant, and (4) the applicant's exclusive right to use the trade-mark in commerce in connection with the goods specified.

Reverting to the specific assignments of error. That plaintiff's mark is descriptive is free from doubt. We lay that question aside without discussion. And it is equally clear that the Thomas Register and the registrations of comparable derivatives of the word "protective" were properly received in evidence, at least on the question of whether the mark "Pro-Tek-Tiv" was descriptive in its use in industry. The probative weight of that evidence on other issues will be considered later.

Did the evidence establish a secondary meaning of the mark "Pro-Tek-Tiv"? It does defendants no good to argue and cite authorities to support the argument that requirements for registration under the Act of 1905 were not met and hence plaintiff's registrations are invalid. Plaintiff's mark was not registered under that Act and no rights flowing from such a registration are sought to be enforced. And, except insofar as the Act of 1905 has been carried forward by and in the Act of 1946, it has been superseded by the latter Act.

But a secondary meaning is the same thing under any statute or absent any statute. And, although Congress has the power to create procedural presumptions from registration to aid in making proof of secondary meaning, and, as noted, has exercised that power, Congress had no power to and does not undertake to legislate upon the substantive law of trade-marks. American Steel Foundries v. Robertson, 269 U.S. 372, 381, 46 S.Ct. 160, 70 L.Ed. 317. Comparison of the different facts necessary to valid registrations under the different Acts does, however, clarify the character of proof necessary in this case for the establishment of the validity or invalidity of plaintiff's registrations.

Under the Act of 1905, among other things, it was necessary to registration that

---

5. "(b) A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein." 15 U.S.C.A. § 1057(b).

ten years of actual and exclusive use next preceding the application be shown. Under the 1920 Act, bona fide use for not less than one year in interstate or foreign commerce was sufficient, 15 U.S.C.A. § 121 (b), while under the Act of 1946 five years of substantially exclusive and continuous use next preceding the date of application is required. Otherwise stated, the plaintiff's registration under the Act of 1920 was valid without any showing of secondary meaning. And it was valid under the Act of 1946 upon a showing of five years of substantially exclusive and continuous use next preceding the application.

When plaintiff seeks to use the registration under the Act of 1920 in the present infringement action it is faced with the fact that although that Act does not require proof of a secondary meaning as a prerequisite to registration, it raises no presumption of secondary meaning and affords plaintiff no aid in now making that proof. Armstrong Paints & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195. But the registration under the Act of 1946 ·does raise that presumption, as heretofore pointed out. So the evidentiary situation presented by the record in the trial court was that plaintiff's claim of secondary meaning was supported by expert opinion evidence, by evidence of the extent of the use and advertisement of the mark, and by the presumption created by registration under the Act of 1946. Opposed to that was the Thomas Register, the other registrations heretofore mentioned, and the testimony of Mr. Klein that he had never heard of plaintiff's mark. The Thomas Register disclosed only that many derivatives of the word "protective" had been used in the past in marks used by various manufacturers, applied to a large variety of goods. There was no proof of when they were used, for how long, whether their use had been discontinued, what the marks had been applied to, or where they had been used. The copies of the registrations offered did show what the marks were applied to, where the registrant's place of business was, and a recital of how long before the date of application the mark had been in use. But they did not show, and there was no effort made to prove, where they had been used (other than at the place of business), whether they were in use after the dates of the registrations or had been discontinued, or how exclusive their use had been.[6] Upon that evidence the court held invalid the registration under the Act of 1946, disregarding the only expert opinion evidence offered, the presumption raised by the statute, and the deference which is usually shown the findings of the Patent Office in matters of this kind. While the court was not bound to accept the opinion evidence, and the presumption created by the statute is a rebuttable one, and the respect usually given the informed judgment of the Patent Office is not mandatory and its judgment not conclusive, there was no evidence of any real substance to the contrary. The evidence therefore does not support the finding of invalidity of the registration under the Act of 1946 or the finding that a secondary meaning had not been shown.

But although the registration is valid and a secondary meaning was established for the mark "Pro-Tek-Tiv", it does not necessarily follow that plaintiff was entitled to a finding or judgment of infringement. The exclusiveness of the monopoly of a descriptive mark with an attained secondary meaning given by statutory registration is limited. It is by no means absolute. The extent of the field to which it extends is circumscribed by the nature of goods specified in the registration to which it is to be applied, the kind of business the registrant is engaged in, and the likelihood of confusion. American Steel Foundries v. Robertson, 269 U. S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Beckwith v. Commissioner of Patents, 252 U. S. 538, 40 S.Ct. 414, 64 L.Ed. 705; Thaddeus Davids Co. v. Davids, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; Rouss v. Win-

6. As heretofore noted, a finding of substantial exclusiveness was sufficient for registration under the Act of 1946.

chester Co., 2 Cir., 300 F. 706; California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 166 F.2d 971. Both the statute and the law of unfair competition confer and protect only the ultimate objective of both—the right to be free from the unfair competition of one who seeks by the use of a similar mark to palm off his products as those of the owner of the trade-mark. The trial judge found that plaintiff's shoes on which the trade-mark "Pro-Tek-Tiv" is used and the defendants' toe protectors on which it uses the mark "Pro-Tek-Toe" are substantially different and reach the public through different retail channels, that there was no evidence of confusion, mistake or deception of purchasers, or the likelihood thereof, and that defendants' use of the mark "Pro-Tek-Toe" does not infringe any trademark rights of the plaintiff.[7] On the issue of unfair competition the court found that plaintiff failed to sustain its allegations of unfair competition.[8] We approve those findings. They are amply supported by the evidence. Plaintiff's manufacturing business is located at Reading, Pennsylvania. It does not and never has manufactured anything like defendants' gadget. It neither sells nor distributes anything more like it than shoes. Plaintiff's sales are through shoe stores to which it wholesales its goods. Defendants' outlet is through sporting goods stores where skates and skate appliances are likely to be found, and through roller skating rinks and shoe repair shops where the need for the gadget might be most likely to occur to the mind

of a prospective purchaser. Plaintiff has no retail outlet in St. Louis or its trade territory.[9] Defendants selected their mark and used it in perfect good faith without knowledge of plaintiff's trade-mark or intent to interfere with or injure plaintiff's business or reputation. The preparation for stretching shoes which defendants tried to sell under the name "Pro-Tek-Toe SHU-EEZ" was unlike anything plaintiff ever made or sold and its manufacture and sale by defendants have been long since discontinued. While defendants' skate brake or toe protector is in a sense related to plaintiff's shoes, the relationship is casual and not sufficiently intimate to cause any confusion in the mind of a purchaser that defendants' article, being of the same kind of goods as plaintiff's, probably came from the same source. The relationship is not as close as that between bread and fruits, both labeled "Sunkist", held unrelated in California Fruit Growers Exch. v. Sunkist Baking Co., 7 Cir., 166 F.2d 971. Defendant was not using the mark in such a manner as to make it appear that its product was that of plaintiff.[10] We find no basis in this record for a finding of infringement or unfair competition. California Fruit Growers Exch. v. Sunkist Baking Co., 7 Cir., 166 F.2d 971; Federal Telephone & R. Corp. v. Federal Television Corp., 2 Cir., 180 F.2d 250; Brown & Bigelow v. B. B. Pen Co., 8 Cir., 191 F.2d 939; Majestic Mfg. Co. v. Majestic Electric App. Co., 6 Cir., 172 F.2d 862; Hiram Walker & Sons v. Penn-Maryland Corp., 2 Cir., 79 F.2d 836.

7. "10. The goods on which the terms Pro-Tek-Tiv and Pro-Tek-Toe are used by the respective parties, are substantially different and such goods reach the public through different retail channels. There is no evidence of confusion, mistake or deception of purchasers or the likelihood thereof.

"11. Defendants' use of its mark Pro-Tek-Toe does not infringe any trade-mark rights of plaintiff."

8. "12. Plaintiff has failed to sustain the allegations of unfair competition."

9. That the absence of direct competition is not in itself decisive, see: Brown & Bigelow v. B. B. Pen Co., 8 Cir., 191 F.2d

939, 944; Cook Chemical Co. v. Cook Paint & Varnish Co., 8 Cir., 185 F.2d 365; Hansen v. Triangle Publications, 8 Cir., 163 F.2d 74. Contra: Kaufman v. Kaufman et al., 223 Mass. 104, 111 N. E. 691; Rouss v. Winchester Co., 2 Cir., 300 F. 706, 723.

10. Thaddeus Davids Co. v. Davids, 233 U. S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; National Picture Theatres v. Foundation Film Corp., 2 Cir., 266 F. 208; Fairbank Co. v. R. W. Bell Mfg. Co., 2 Cir., 77 F. 869; Majestic Mfg. Co. v. Majestic Electric App. Co., 6 Cir., 172 F.2d 862; American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317.

416

For the reasons stated, the judgment will be modified by eliminating therefrom the statement "That Trade Mark Registration No. 533,473 of November 15, 1950 is invalid", and, as so modified, the judgment will stand affirmed.