TIME, Inc.

v.

LIFE TELEVISION CORP.

TIME, Inc.

v.

LIFE TELEVISION CO. OF ST. PAUL.

Civ. A. Nos. 4517, 4718.

United States District Court,
D. Minnesota, Fourth Division.

July 28, 1954.

Pierce Butler and Theophil Rusterholz, St. Paul, Minn. (Harold R. Medina, Jr., and Cravath, Swaine & Moore, New York City, and Doherty, Rumble, Butler & Mitchell, St. Paul, Minn., of counsel) appeared in behalf of the plaintiff.

William P. Murphy and Silver, Goff, Murphy, Ryan & Dillon, St. Paul, Minn., appeared in behalf of defendants.

NORDBYE, Chief Judge.

These cases were consolidated and came on for trial before the Court without a jury.

Plaintiff, a New York corporation and publisher of the well-known magazines Life and Time, brings this action for trade-mark infringement and unfair competition. It seeks to enjoin the defendants from engaging in the retail sale of television sets under the name Life. The action was commenced by the filing of an initial complaint against Life Television Corporation. Thereafter, an additional action was commenced against Life Television Corporation of St. Paul.

Plaintiff registered the mark Life in the United States Patent Office in connection with certain of its uses, including registration No. 372,500 for a weekly magazine, registered on October 31, 1939, and republished under the Lanham Trade-Mark Act of 1946, 15 U.S.C.A. § 1051 et seq., on June 26, 1951, and registration No. 380,316 for sound and motion picture films and for synchronizing apparatus for simultaneously reproducing coordinated light and sound effects, registered August 20, 1940.

An extended discussion of the facts is unnecessary. It is of common knowledge that the plaintiff's magazines Life and Time are leaders in circulation

among national weekly magazines. Life magazine ranks first as a national advertising media. In addition, Time, Incorporated, engages in the publication of other magazines, such as Fortune, House and Home, and Architectural Forum. It produces numerous television programs, the film "The March of Time"—which displays both the Life and Time trademarks—and other feature films and shorts. It has published two books, Life's Picture History of World War II and Life's Picture History of Western Man. Since 1952 it has had a fifty per cent interest in an Albuquerque television station and since 1953 an eighty per cent interest in a television station in Salt Lake City. It may be stated, therefore, that by reason of the production and documentation of film shorts, feature films, radio shows, television shows, film strips, the operation of television stations, and by reason of its various publications, Time, Incorporated, is in the communication field and has extended activities in that field in the broadest sense of that term. Plaintiff, however, does not intend to enter the retail television sales business.

Plaintiff spends huge sums in promoting its trademarks. As part of its advertising campaign for Life magazine, it distributes to the advertisers of that magazine tags and advertising reprints bearing the slogan "Advertised in Life." These are displayed with the product of the advertisers to aid in selling the product. On these tags appear the now familiar Life symbol—the word Life in white block letters on a rectangular red background. The tags and advertising reprints have been featured in aid of selling television sets in the Twin Cities and elsewhere throughout the United States. Merchants have displayed their television sets with these tags and reprints conspicuously placed and arrayed so as to attract the prospective buyer's attention to the fact that these particular sets are the ones which were advertised recently in Life magazine.

The television sets sold by defendants are purchased from certain manufacturers and are then marked by defendants with the name Life in block letters. They launched their business with the intention and purpose of simulating in their advertising plaintiff's trademark Life. They advertise in local newspapers where the name Life is again in lettering identical to that used by plaintiff, except that they schemingly insert a white line through each letter upon the assumption that this minute change will free it from the charge of infringement of the Life trademark. Their radio advertising describes their product merely as Life TV and refers to Life's Minneapolis (and St. Paul) showrooms. Their trucks are painted red, and block letters in white spell out Life on the side of each, simulating the format used by plaintiff in Life magazine. The red rectangle with white block letters appears also on signs at the defendants' showrooms and covers an entire wall inside the stores. In some of their advertising, however, they employ red block letters for the word Life on a white background. In addition, to their customers defendants offer what they term a "Life-Time" guarantee. In this guarantee the word Time appears in a style of lettering similar to that used on Time magazine.

■■ The jurisdictional foundation of this action is threefold. The first claim of plaintiff is predicated upon Section 32 of the Lanham Act, 60 Stat. 437 (1946), 15 U.S.C.A. § 1114, which authorizes a civil action for the infringement "in commerce" of a registered mark. Section 39 of that Act, 15 U.S.C.A. § 1121, gives the district court jurisdiction of all actions arising under the Act without regard to diversity or the amount in controversy, and Section 45, 15 U.S.C.A. § 1127, defines "commerce" as meaning all commerce which may be regulated lawfully by Congress. It is clear that Congress may constitutionally regulate wholly intrastate activity if it has a substantial economic effect upon interstate commerce. Therefore, this Court has jurisdiction of the claim for trademark infringement though the defendants' business is wholly intrastate—

since the infringement, if substantiated, will undoubtedly affect the interstate business of plaintiff. Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962; National Tuberculosis Ass'n v. Summit County Tuberculosis & Health Ass'n, D.C.N.D. Ohio, 1954, 122 F.Supp. 654; Cole of California, Inc. v. Collette of California, Inc., D.Mass.1948, 79 U.S.P.Q. 267; Commentary, 15 U.S.C.A. pages 265, 268.

■■ That this claim for trademark infringement is not insubstantial will be shown below. And the facts which give rise to that claim will also support the allegation of unfair competition. Therefore, under the Hurn v. Oursler doctrine of pendent jurisdiction, 298 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, this Court has jurisdiction of the latter claim as well. 28 U.S.C. § 1338(b) (1948). Moreover, the parties are of diverse citizenship and the controversy presented is whether or not the plaintiff's business investment in its trademarks will be safeguarded by enjoining the alleged infringement by the defendants. That the value of that investment establishes the amount in controversy in cases of this sort is well settled. Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517; Hanson v. Triangle Publications, Inc., 8 Cir., 1947, 163 F.2d 74; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F. 2d 774; Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., D.C.E.D. Pa.1937, 20 F.Supp. 703. The complaint and the evidence herein show the amount of plaintiff's investment to exceed $3,000.

■ In an action for unfair competition based upon the use of a trademark similar to the complainant's, the first inquiry must be to the question whether the public mind attributes to that mark a connection with the products or the business of the complainant. This also is true in an action for infringement of a registered mark which is not purely arbitrary or meaningless, for the Lanham Act, Section 2(f), 15 U.S.C.A. § 1052(f), allows registration of such a mark only if it has "become distinctive of the applicant's goods in commerce." This question is, of course, one of fact and not of principle and therefore little help can be found in previous decisions. But it seems to be the practice of courts in determining whether the plaintiff's mark has acquired a secondary meaning to consider (1) the length and manner of use of the name or mark in question, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts toward promoting a conscious connection in the minds of the public of that name or mark with a particular product. See 52 Am.Jur., Trademarks, Tradenames, and Trade Practices, § 73, and cases collected in 150 A.L.R. 1067, 1082–1094 (1944).

■■ Defendants in the case at bar assert that plaintiff has no protectible interest in the trademark Life because of the frequent use of that mark by others. In connection with that assertion, it has introduced into evidence a list of 213 registrations in the Patent Office of marks making use of the word "Life" either alone or in connection with other words or pictures. This kind of evidence has quite often been ignored by courts in the past—usually upon the somewhat unperceptive ground that third-party infringements cannot justify or excuse the infringement of the defendant,[1] at least if the plaintiff had no knowledge of the other uses.[2] But however relevant the plaintiff's knowledge of the third-

---

1. See, e. g., Bond Stores, Inc. v. Bond Stores, Inc., 3 Cir., 1939, 104 F.2d 124; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F. 2d 774; Lone Ranger, Inc. v. Currey, D.C.M.D.Pa.1948, 79 F.Supp. 190; Ford Motor Co. v. Ford Insecticide Corp., D.C.S.D.Mich.1947, 69 F.Supp. 935; Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., D.C.E.D.Pa.1937, 20 F.Supp. 703; Taylor v. Carpenter, C. C.D.Mass.1844, 23 Fed.Cas.No.13,785, page 742; cf. Majestic Mfg. Co. v. Majestic Electric Appliance Co., D.C.N.D. Ohio, 1948, 79 F.Supp. 649.

2. E. g., Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc. and Taylor v. Carpenter, supra, note 1.

party uses may be when the defendant's claim is that the plaintiff has abandoned his trademark,[3] it can have no influence upon the decision of whether plaintiff's mark has acquired a secondary meaning. Similarly, it is beside the point to ponder whether or not other uses can "excuse" the defendant's wrong. For there can be no wrong at all unless there is an identification in the public mind of the plaintiff and its mark. And widespread use of a given mark by numerous producers is certainly relevant both as to the existence and the strength of that identification.[4]

However, in determining the probity of defendants' evidence, it is proper to notice that there was offered no proof of where the third-party marks had been used or whether or not their use had even been continued after their registration. Further, the vast majority of registrations in evidence make use of the word "Life" only in combination with others which modify it and always in its common, descriptive sense. Even the few registrations of the word by itself are used in connection with commodities so unrelated to plaintiff's that no likelihood of confusion seems possible. In any event, they do not detract from plaintiff's contention that its mark has acquired a secondary significance in the "communications field".

■ It is not necessary to agree with the plaintiff that its mark has acquired a secondary meaning so broad as to preempt the whole communications field. It suffices that this Court does find in the evidence that plaintiff's vast publication activities and its extensive advertising and promotional schemes in connection therewith suggest to nearly everyone that the trademark use of the word "Life" connotes the publication of a widely circulated magazine which uses its name to sell the sundry products of its advertisers.

■ Proceeding upon the basis that plaintiff has established the foregoing secondary meaning, it seems obvious that defendants' advertising and labeling are likely to cause confusion in the public mind as to the source of the goods it markets. The conclusion is inescapable that the defendants set out with the purpose of trading upon plaintiff's established trademark and deliberately assimilated plaintiff's style in order to do so. A finding of a likelihood of confusion under such circumstances is abundantly supported by the authorities. It is said that imitation may often supply the place of proof—in the absence of evidence to the contrary the court accepting the defendant's own estimate of the probability of confusion. E.g., G. H. Mumm Champagne v. Eastern Wine Corp., 2 Cir., 1944, 142 F.2d 499, 501; Time, Inc. v. Ultem Publications, 2 Cir., 1938, 96 F.2d 164, 165; 3 Callmann, Unfair Competition and Trademarks, § 85.1(b), (2d ed. 1950); 2 Nims, Unfair Competition and Trademarks, § 355a (4th ed. 1947).

■ Cases will arise, of course, where the facts so clearly establish that no confusion will result that the intent of the defendant becomes immaterial. See, e. g., Kann v. Diamond Steel Co., 8 Cir., 1898, 89 F. 706. However, in the present case, the finding as to confusion need not rest solely upon the defendants' fraudulent motives. At trial plaintiff called ten witnesses who were selected so as to represent various walks of life.

3. See 3 Callmann, Unfair Competition and Trade-Marks 1239, 1506 (2d ed. 1950); 2 Nims, Unfair Competition and Trade-Marks § 408 (4th ed. 1947).

4. Vogue Co. v. Thompson-Hudson Co., 6 Cir., 1924, 300 F. 509; French Battery & Carbon Co. v. Prest-O-Lite Co., D.C., 1920, 265 F. 1013; Huntington Laboratories, Inc. v. Onyx Oil & Chemical Co., 1948, 165 F.2d 454, 35 C.C.P.A., Patents, 819; National Fruit Products Co. v. Dwinell-Wright Co., D.C.Mass.1942, 47 F.Supp. 499; Ruppert, Inc., v. Knickerbocker Food Specialty Co., D.C.E.D. N.Y.1923, 295 F. 381; see Quaker State Oil Ref. Co. v. Steinberg, 1937, 325 Pa. 273, 189 A. 473; cf. Sun Oil Co. v. Watson, D.C.D.C.1954, 122 F.Supp. 629; see Handmacher-Vogel, Inc. v. Weathercrest Jackets, Inc., Comm'r Patents, 1954, 101 U.S.P.Q. 417, 418. See also cases in Note, 150 A.L.R. 1067, 1086 (1944).

The testimony of these witnesses showed that they had in fact believed either that the plaintiff had entered the retail television business or that there was some other connection between the businesses of the parties. Each side produced its experts who testified to the presence or absence of a likelihood of confusion. While neither isolated instances of actual confusion nor the testimony of experts necessarily establish a likelihood of confusion, see Callmann, supra, at 1570–1573, it also is the conclusion of this Court that the type and layout used by defendants is so similar to that used for many years by plaintiff that even a person who would not ordinarily assume a connection between the parties from the mere concurrent use of the trademark Life would be led to believe that plaintiff's business was in fact connected with defendants'. The products of the parties are not so unrelated that it would be unreasonable for the ordinary purchaser to believe that the publishers of Life had expanded into a new field—for singleness of layout imports a singleness of source. The slight alteration effected by defendants by drawing a line through their letters is insignificant, for in determining whether there is a deceptive similarity the test is not whether when laid side by side the parties' marks are distinguishable, but whether the mark of the alleged infringer is similar to the ordinary purchaser's recollection of the plaintiff's mark—for it is on the basis of that recollection that the consumer makes his decision to purchase. See generally, 1 Nims, supra, at 672–682.

Defendants assert that even if plaintiff establishes that its mark has acquired a secondary meaning and that defendants' use raises a likelihood of confusion in the public mind, nevertheless this action must fail unless it is shown that plaintiff actually intends to expand its business to include the retail sale of television sets or that defendants' product is so inferior that the good-will of the plaintiff will be diminished by the confusion. Decisions of certain judges of the Second Circuit Court of Appeals [5] support this contention. For of recent years,[6] these judges have felt constrained to check the gradual expansion of protection afforded trademarks which had culminated in a rule that accepted confusion of source as the only indispensable requisite for maintenance of the action.[7] They have circumscribed this accepted rule by insisting that where the products of the parties are not directly competing, the only interests to be protected are the plaintiff's and that these interests are only two: (1) the interest in preventing his reputation from being stained in the minds of his customers, and (2) the interest in preventing the second user from exploiting a field which the plaintiff himself intends to invade. Protection of the first interest, of course, would logically require a showing that the defendant's reputation actually is bad. Yet historically the basis of the action has been the idea that the first user

5. It cannot be said that the Second Circuit as a whole has adopted the view suggested. It seems fair to conclude, in fact, that the outcome of many recent trademark appeals in that court has depended on which panel of judges were assigned to the case. See Judge Clark's review of this divergence of opinion and his indictment thereof in Hyde Park Clothes, Inc. v. Hyde Park Fashions, Inc., 2 Cir., 1953, 204 F.2d 223, 226 (dissenting opinion).

6. See especially, Hyde Park Clothes, Inc. v. Hyde Park Fashions, Inc., supra, note 5; Federal Telephone & Radio Corp. v. Federal Television Corp., 2 Cir., 1950, 180 F.2d 250; S. C. Johnson & Son, Inc. v. Johnson, 2 Cir., 1949, 175 F.2d 176, and comments on this narrowing of protection in Lunsford, Trade-Mark Infringement and Confusion of Source: Need for Supreme Court Action, 35 Va. L.Rev. 214, 221–222 (1949); Zlinkoff, Monopoly Versus Competition, Significant Trends in Patent, Anti-Trust, Trade-Mark, and Unfair Competition Suits, 53 Yale L.J. 514, 538–541 (1944).

7. This rule, having its inception in Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, L.R.A.1918C, 1039, has become embodied in the Restatement of Torts, §§ 711–754, as well as being generally followed in federal and modern state decisions. See Note, 66 Harv.L. Rev. 1094, 1098 (1953).

of a mark should not be subjected to the risks and hazards of another's business. And one should not ignore what have traditionally been thought of as additional protectible interests in trademark cases —the interests of the public in being able to identify a product or manufacturer with which it has become familiar, see 1 Nims, supra, § 6, and the interest in promoting fair and ethical advertising practices. Congress has, in enacting the Lanham Act, declared as its first aim the protection of the public "so that it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get." Sen.Rep.No. 1333, 79th Cong., 2d Sess., U.S.Code Cong.Serv.1946, 1274. Moreover, Congress has in rather plain language created a right of action whenever an unauthorized use of a registered mark "is likely to cause confusion or mistake or to deceive purchasers as to the source of [sic] origin of such goods or services * * *." [8]

Defendants have cited no cases which suggest that this Circuit has followed this so-called recent "trend". Brown & Bigelow v. B. B. Pen Co., 8 Cir., 1951, 191 F.2d 939, expressly recognized that likelihood of confusion of source was the only issue to be decided, but found such likelihood not to exist. Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 8 Cir., 1952, 199 F.2d 407, similarly decided only that confusion was not shown. Moreover, the decision in Hanson v. Triangle Publications, Inc., 8 Cir., 1947, 163 F.2d 74, probably expands rather than restricts the scope of protection to be afforded trademarks. Finally, the record here shows that the defendants' business practices are questionable. They offer a "Life-Time" guarantee which upon inspection proves to be only a one-year guarantee of the television picture tube and a guarantee to provide service work as long as the set is in the possession of the original purchaser. And defendants could cease doing business tomorrow and the guarantee would be a worthless piece of paper. In their advertisements in the newspapers and over the radio, they flamboyantly announce that no down-payment is required, but actually obtain one in the majority of purchases by leading their customers to a small-loan agency to obtain a loan for that purpose. In January of this year, the State of Minnesota instituted an action against defendants pursuant to Minnesota Session Laws 1947, Chapter 587, and particularly Section 8, subdivisions 1, 2 and 3 thereof, M.S.A. § 362.14, to restrain them from continuing with certain advertising techniques and practices in violation of Section 620.52, Minn.Stat. Ann. On stipulation of the parties, a judgment was entered on February 23, 1954, in one of the local district courts of this State restraining defendants from using in their advertising the unqualified words "no down payment" and "Life-Time Guarantee" or "Life-Time service guarantee" in connection with the sale of Life television sets. Since the customers of defendants are potential customers of plaintiff, there is a danger of injury to plaintiff's good will. Under any theory, therefore, some relief must be afforded the plaintiff.

■■■ More difficult is the question of the scope of relief to be given in this action. The general principle that the relief should be commensurate with the infringement shown [9] is of little help, for infringements are sometimes crude and sometimes subtle. The likelihood of confusion heretofore found, for example, rests largely upon the direct and inten-

8. 15 U.S.C.A. § 1114.

9. Cases can be found which present facts similar to those in the present case but which grant only limited relief. Vogue Co. v. Thompson-Hudson Co., 6 Cir., 1924, 300 F. 509, held that use of the name "Vogue" alone on millinery did not entitle the plaintiff, Vogue magazine, to an injunction. But since defendant also used the "V-girl" on its label, the court held that plaintiff was entitled to enjoin such use. In Time, Inc. v. Ultem Publications, 2 Cir., 1938, 96 F.2d 164, 165 the defendant was publishing a magazine called "Movie Life" and copied the plaintiff's block letters and color combination. The court ordered a change in defendant's make-up but not a change in its name.

-tional imitation by defendants of plaintiff's layouts. Yet the question arises whether the likelihood of confusion will disappear should the defendants be forced only to adopt a new lettering style or whether their infringement is too subtle and enduring to be so easily obviated.

■ Defendants assert that no one can appropriate a common English word to its own exclusive use. But it should be recognized that the oft-repeated assertion that common words are entitled to a much more restricted protection than are arbitrary or coined words, is an accepted generalization of fact, but not necessarily an operative proposition of law. Secondary-meaning marks may usually be weaker than arbitrary marks, but this is a matter of proof and that alone. If the secondary meaning in the commonest term has become powerful enough so that confusion is a likely result of another's trademark use of the term, the infringer may be enjoined. Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 1936, 85 F.2d 46.

■ Plaintiff asserts that the use of the Life mark alone on the defendants'

product constitutes infringement because public confusion as to the source of that product is likely. It places primary reliance, however, upon the contention that the public is likely to believe that it sponsors or endorses defendants' product. It points to the fact that as part of its program for many years to promote its mark, it distributes to its advertisers for display with their products, including television sets, tags and advertising matter bearing the legend "Advertised in Life". A similar practice by the publisher of "Seventeen" magazine has been the basis for decisions of Courts of Appeal of this and of the Second Circuit that manufacturers of teen-age wearing apparel had engaged in unfair competition when they branded their products with the name "Seventeen." [10] These cases, as well as others decided in recent years,[11] recognize confusion of sponsorship as a legitimate basis for the action of unfair competition. There is no good reason to assume that that basis would not be accepted by the Court of Appeals in this Circuit today.[12] And although the Eighth Circuit case of Hanson v.

---

In General Motors Corp. v. Circulators & Devices Mfg. Corp., D.C.S.D.N.Y.1941, 38 F.Supp. 459, plaintiff, manufacturer of "Frigidaire" refrigerators, succeeded in enjoining the use of "Frigid" and "Air" in combination on electric fans but could not stop use of "Frigid" alone because there was no evidence that its use alone had resulted in confusion. And in Royal Baking Powder v. Davis, C.C.E.D.Mich. 1885, 26 F. 293, since the coloring and design of defendant's label were the bases for finding confusion, plaintiff could enjoin only that coloring and design.

10. See Triangle Publications v. Rohrlich, 2 Cir., 1948, 167 F.2d 969; Hanson v. Triangle Publications, Inc., 8 Cir., 1947, 163 F.2d 74, certiorari denied, 1948, 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424. Both these decisions were decided on the theory of unfair competition because the applicable trademark law was the Act of 1905, where the goods of the parties were required to be of the "same descriptive properties." Since the 1946 Act requires that the unauthorized use result in "confusion of source or origin" and does not mention confusion of sponsorship, these cases would presumably be decided on the same theory today.

11. See Vogue Co. v. Thompson-Hudson

Co., 6 Cir., 1924, 300 F. 509; Radio Corp. of America v. R.C.A. Rubber Co., D.C.N.D.Ohio, 1953, 114 F.Supp. 162; Esquire, Inc. v. Maira, D.C.M.D.Pa. 1951, 101 F.Supp. 398; Esquire, Inc. v. Esquire Bar, D.C.S.D.Fla.1941, 37 F. Supp. 875; Copacabana, Inc. v. Breslauer, Comm'r Patents, 1954, 101 U.S. P.Q. 467.

12. The general view is that the issue of unfair competition is a matter of local law to be decided according to state authorities regardless of the jurisdictional foundation of the action. See Note, 37 Minn.L.Rev. 268, 274 (1953). Since Hanson v. Triangle Publications, Inc., supra, note 10, did not decide the choice-of-law issue, it might be contended that the law of Minnesota does not recognize confusion of sponsorship as a basis for the action and that the Hanson case is therefore not controlling. However, Landstrom v. Thorpe, 8 Cir., 1951, 189 F.2d 46, 26 A.L.R.2d 1170, involving unfair competition through disparagement of a rival's goods seems to be a holding that federal law governs the unfair competition issue when jurisdiction is dependent upon 28 U.S.C. § 1338(b) rather than diversity. And although the Minnesota court in Howards Clothes, Inc. v. How-

Triangle Publications, Inc.,[13] might be distinguished on the ground that Seventeen magazine purported to be an authority on fashions and therefore might seem to be an endorser of the product of its advertisers, while Life is not,[14] the decision in that case seems to rest on broader grounds. Although the trial court in that case had rested its decision on the ground that the public was likely to think plaintiff had approved of the defendant's dresses, the basis of the Appellate Court's reasoning is that (1) the parties were in competition since the plaintiff distributed its tags in order to identify and promote the sale of dresses and the defendant used the Seventeen label for the same purpose, and (2) the defendant's deliberate attempt to get a free ride on the good-will of the plaintiff in itself justified an injunction. There is insufficient distinction between the Hanson case and the present factual situation to warrant a lower court in refusing to follow its reasoning.[15]

█ The confusion of source here must be appraised and the rights of the parties determined in light of the particular facts. Here, we do not have an honest mistake by a well-intending concern in adopting a trademark of another. Here, the infringement was not fortuitous, but a designed attempt to capitalize in the television field upon the publicity and prestige attained by Life magazine in the communication field. Defendants' television business was designed and devoted to hitch-hiking on the good name of Life and to borrow its good-will. In determining, therefore, the relief which should be granted a prevailing plaintiff in cases like the present, any doubts as to the adequacy of the proposed remedy are resolved against the transgressor. See Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 130, 67 S.Ct. 1136, 91 L.Ed. 1386; Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; 3 Callmann, supra, § 85.1 (b); 2 Nims, supra, § 373d.

█ Even though it be assumed that the use of the word Life alone, without simulating the format of plaintiff's trade-mark, would be permissible, it is extremely doubtful whether, since defendants have been practicing their fraud and deceit for over a year, the harm has not been irreparably consummated. As an example, the evidence disclosed that one of the retailers in the Twin Cities displaying television sets nationally advertised in Life magazine, refused to permit the labels "Advertised in Life" to be displayed on the merchandise for fear the public would assume that the product displayed had some connection with defendants' Life television sets. It is extremely unlikely, therefore, that a mere alteration in defendants' layouts [16] would obviate the present public impression, which defendants knowingly created, that there is a connection between their business and the business of plaintiff. And since defendants by their past

---

ard Clothes Corp., 1952, 236 Minn. 291, 52 N.W.2d 753, has observed that a requirement of the action for unfair competition is public conviction that it "is getting the plaintiff's product when [it] is in fact getting that of the defendant," this Court does not think that Minnesota has rejected the confusion-of-sponsorship test.

13. 163 F.2d 74, certiorari denied, 1948, 332 U.S. 855, 68 S.Ct. 387.

14. The evidence introduced at trial does not suggest that the "Advertised in Life" tags show approval of the products with which they are displayed, but serve only to identify articles which have been "presold" by appearing in plaintiff's magazine. However, this function is the same as that relied upon by the court in the Hanson case.

15. Defendants attempt to distinguish the Hanson case on the further ground that it involved a mark found by the court to be arbitrary and fanciful. That there is no dependable distinction between arbitrary or fanciful and secondary-meaning marks seems quite evident.

16. Defendants also suggest that they are willing to add to their name an explanatory phrase indicating that their businesses have "no connection with any of the innumerable companies which use the name of 'Life'." Without doubt, this is the remedy ordered in many cases, especially those which involve defendant's use of his own family name. Yet the use of such phrases is largely an ineffective compromise, 2 Nims, supra, § 366f, and in any event is often rejected in cases of intentional deception. Id. § 373d.

conduct and past business practices have produced confusion which, if permitted to continue, will irreparably diminish plaintiff's goodwill, the Court is justified in granting relief much broader than it might have, had the infringement been an innocent one. There is no substance to defendants' contention that the character of the advertising and the claims made by advertisers in Life magazine reflect adversely upon the reputation of plaintiff so that defendants' infringement and business methods could not seriously impair plaintiff's reputation. In so concluding, this Court does not necessarily approve of the flamboyant claims commonly made by advertisers in current magazines. But Life magazine in that regard compares favorably with the mores of the magazines currently found in the American household.

It follows from the foregoing that plaintiff is entitled to an injunction enjoining the defendants from any trademark use of the marks Life and Time, or any simulation thereof, together with its costs and disbursements. A proposed decree may be presented by the plaintiff upon ten days' notice.

An exception is allowed.